DOROTHY ANN FINCH & others[1] vs. COMMONWEALTH HEALTH
INSURANCE CONNECTOR AUTHORITY & others.[2]

Suffolk. November 1, 2010. - May 6, 2011.

Present: IRELAND, SPINA, CORDY, GANTS, & DUFFLY, JJ.

*Constitutional Law,* Equal protection of laws, Judicial review. *Alien. Com-
monwealth Health Insurance Connector Authority. Words,* "National
origin," "Alienage."

This court concluded that the protection against discrimination on the basis of
national origin, as enumerated in art. 106 of the Amendments to the Mas-
sachusetts Constitution, does not include protection against discrimination
on the basis of alienage, i.e., one's immigration status. [661-667] DUFFLY,
J., dissenting.

This court did not reach the question whether any provision of the Mas-
sachusetts Constitution provides special protection against discrimination
on the basis of alienage beyond the general contours of equal protection.
[667-668]

In the context of a civil action challenging the constitutionality of a statute
that excludes aliens lawfully residing in the Commonwealth from participat-
ing in the Commonwealth Care Health Insurance Program, a premium as-
sistance program in which enrollees pay a portion of their health insurance
premium based on a sliding scale with the remainder paid by the Com-
monwealth Health Insurance Connector Authority, and for which the Com-
monwealth receives certain Federal reimbursements, this court concluded
that a State classification based on alienage should not be subjected to a
rational basis standard of review under the Massachusetts Constitution to
determine whether there is a rational relationship between the disparity of
treatment between citizens and aliens and some legitimate governmental
purpose. [668-678] GANTS, J., dissenting, with whom CORDY, J., joined.
DUFFLY, J., concurring.

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on February 25, 2010.

The case was reported by *Cordy,* J.

*Wendy E. Parmet (Lorianne Sainsbury-Wong* with her) for the
plaintiffs.

---

[1]Roxanne S. Prince and Jane Does Nos. 1 and 2 (pseudonyms), individually
and on behalf of all similarly situated persons.

[2]The executive director of Commonwealth Health Insurance Connector
Authority and the Commonwealth, as intervener.

*Kenneth W. Salinger*, Assistant Attorney General, for the intervener.

*Carl Valvo* for Commonwealth Health Insurance Connector Authority & another.

The following submitted briefs for amici curiae:

*Mary M. Calkins, W. Keith Robinson, & Vid Mohan-Ram*, of the District of Columbia, & *Michael J. Tuteur* for Irish Immigration Center.

*Julie A. Su, Justin Ma, Daniel S. Floyd, Elaine Ki Jin Kim, & Minae Yu*, of California; *Meredith Higashi*, of the District of Columbia; & *Ami Gandhi*, of Illinois, for Asian Pacific American Legal Center & others.

*Victoria Pulos* for Massachusetts Law Reform Institute & others.

*Anthony D. Mirenda, Ara B. Gershengorn, Thomas Ayres, Katie Marie Perry, & John Reinstein* for American Civil Liberties Union of Massachusetts.

SPINA, J. This case involves four questions reserved and reported from the county court relating to the standard of review applicable to a statute that excludes aliens lawfully residing in the Commonwealth from participating in a public benefit program for which the Commonwealth receives certain Federal reimbursements. Commonwealth Care Health Insurance Program (Commonwealth Care) is a premium assistance program in which enrollees pay a portion of their health insurance premium based on a sliding scale with the remainder paid by the defendant Commonwealth Health Insurance Connector Authority (Connector). The plaintiffs are Massachusetts residents who either have been terminated from Commonwealth Care or denied eligibility solely as a result of their alienage. Specifically, the plaintiffs have brought a class action against the Connector alleging that exclusion from Commonwealth Care pursuant to an appropriation, St. 2009, c. 65, § 31 (*a*), violates their rights under the Massachusetts Constitution. The statute eliminates the plaintiffs' eligibility for Commonwealth Care by adopting the same eligibility standards applicable to federally funded public benefit programs as set forth in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub.

L. No. 104-193, as amended, codified at 8 U.S.C. §§ 1601-1646 (2006).

On the basis of stipulated facts and pursuant to Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1410 (1996), a single justice of this court reserved and reported four questions:

> "1. Does the protection against discrimination on the basis of 'national origin,' as enumerated in art. 106 of the Amendments to the Massachusetts Constitution, include protection against discrimination on the basis of alienage, i.e., one's immigration status?

> "2. If the answer to question one is negative, does any other provision of the Massachusetts Constitution provide special protection against discrimination on the basis of alienage beyond the general contours of equal protection?

> "3. If the answers to question one and to question two are negative, should a State classification based on alienage be subjected to a 'rational basis' standard of review under the Massachusetts Constitution to determine whether there is a rational relationship between the disparity of treatment between citizens and aliens and some legitimate governmental purpose?

> "4. If the answer to either question one or to question two is affirmative, what level of judicial scrutiny should be applied to the classification contained in § 31 (*a*), especially in light of the character of the Commonwealth Care program and the nature of its funding mechanisms?"

We answer the first three questions in the negative and need not reach Question 4.

*Facts.* The following facts are taken from the stipulation of the parties accompanying the reserved and reported questions.

Commonwealth Care is a key feature of the Commonwealth's initiative to help all Massachusetts residents obtain and maintain health insurance coverage, as set forth in St. 2006, c. 58. Portions of that statute, codified at G. L. c. 118H, establish Commonwealth Care with the declared purpose of "reducing uninsurance in the commonwealth." G. L. c. 118H, § 2. Commonwealth Care seeks to achieve this purpose by providing a

structured premium assistance program under which enrollees pay a portion of premium for health insurance coverage with the remainder paid by the Connector. See G. L. c. 118H. Commonwealth Care enrollees are eligible for three plan types based on income levels ranging from one hundred per cent to 300 per cent of the Federal poverty level. Total enrollment in Commonwealth Care as of June, 2010, was 160,318 and the Connector paid one hundred per cent of premium for 93,778 of those enrollees. Commonwealth Care premium assistance payments totaled $717 million in fiscal year 2010.

The original eligibility requirements for Commonwealth Care were set forth in G. L. c. 118H, § 3 (a), which provides that an individual may enroll if he or she has been a resident of the Commonwealth for six months, has household income below 300 per cent of the Federal poverty level, is uninsured, and is not eligible for certain other State, Federal, or employer-subsidized health insurance programs. "Resident," for purposes of G. L. c. 118H, is defined, in part, as "a person living in the commonwealth . . . including a qualified alien . . . or a person who is not a citizen of the United States but who is otherwise permanently residing in the United States under color of law; provided, however, that the person has not moved into the commonwealth for the sole purpose of securing health insurance under this chapter."[3] G. L. c. 118H, § 1. Under the terms of its enabling act, therefore, Commonwealth Care is open to participation by lawful resident aliens, approximately 29,000 of whom were enrolled in the program as of August, 2009.

Both State and Federal funds support the provision of premium

_____

[3]The statutory terminology in this field is somewhat confusing. Broadly speaking, "qualified alien[s]" are lawful permanent residents and certain other categories of noncitizens. See 8 U.S.C. § 1641(b) (2006) (defining "qualified alien"). Qualified aliens may then be divided into those who are eligible for Federal benefits and those who are federally ineligible. 8 U.S.C. § 1612(a) (2006) (qualified aliens not eligible for Federal funds; listing exceptions). Federally eligible aliens are those who fall into certain statutory categories including alien veterans and military personnel on active duty as well as particular categories of refugees, asylees, deportation-withheld noncitizens, victims of domestic violence, Cuban or Haitian immigrants, Amerasians, Native Americans born in Canada or United States territories, Filipino veterans, Hmong or Highland Lao veterans, victims of severe forms of trafficking, and Iraqi or Afghan special immigrants. See 8 U.S.C. §§ 1612, 1641.

assistance payments on behalf of Commonwealth Care enrollees. Payments from State funds are made through the Commonwealth Care Trust Fund, established by G. L. c. 29, § 2000. This trust fund is credited with monies from a variety of sources including employer contributions (payable regardless of the immigration status of the employee), revenue from "free rider" surcharges, transfers from the Health Safety Net Trust Fund, revenue from "individual mandate" penalties, and a portion of cigarette tax revenues. The revenues earmarked for the trust fund have not heretofore covered the cost of Commonwealth Care so annual appropriations have been required from the Commonwealth's General Fund. See St. 2010, c. 131, line item 1595-5819 (2011 appropriation of $702 million); St. 2009, c. 27, § 119 (b) (2010 appropriation of $592 million).

Federal funds are provided through a Medicaid "demonstration project" pursuant to § 1115 of the Social Security Act, codified at 42 U.S.C. § 1315 (2006). In the demonstration project, Commonwealth Care expenditures made on behalf of federally eligible individuals are treated as expenditures under the Commonwealth's Medicaid plan and receive partial reimbursement from the United States. The reimbursement rate for federally eligible individuals is approximately fifty per cent of total expenditures but, pursuant to the American Recovery and Reinvestment Act of 2009, was increased to 61.59 per cent in fiscal year 2010. Commonwealth Care receives no reimbursement from the Federal government in respect of expenditures made on behalf of federally ineligible individuals. Federal reimbursements for fiscal year 2010 were $419.6 million.

The Commonwealth initially permitted all residents, as defined in G. L. c. 118H, § 3, to enroll in Commonwealth Care whether federally eligible or not. In the absence of Federal reimbursement, the Commonwealth assumed one hundred per cent of the cost of providing Commonwealth Care subsidies to federally ineligible aliens. Due to the level of Federal reimbursement, at least two federally eligible residents (citizens or federally eligible aliens) could be enrolled in Commonwealth Care for the same cost to the State as one member of the plaintiff class. In 2009, the Legislature made certain changes to the eligibility requirements of Commonwealth Care in a supplemental appro-

priation for fiscal year 2010, St. 2009, c. 65. Specifically, § 31 of that act (hereinafter, § 31) provides that:

> "(*a*) Except as provided in subsection (*b*), notwithstanding any general or special law to the contrary, an eligible individual pursuant to section 3 of chapter 118H of the General Laws shall not include persons who cannot receive federally-funded benefits under [§§] 401, 402, and 403 of [PRWORA].

> "(*b*) Notwithstanding any general or special law to the contrary, the secretary of administration and finance, the secretary of health and human services and the executive director of the [Connector] . . . may establish or designate a health insurance plan in which a person who cannot receive federally-funded benefits [under PRWORA] may enroll effective September 1, 2009 . . . . Total state costs of providing coverage to all such persons . . . shall not exceed $40,000,000 for fiscal year 2010."

As a result of § 31 (*a*), aliens who are federally ineligible under PRWORA are excluded from participation in Commonwealth Care.[4] Simultaneously, § 31 (*b*) permitted the establishment of a new entity, the Commonwealth Care Bridge program (Commonwealth Bridge), which provides a form of health insurance continuation to individuals previously covered by Commonwealth Care but who lost eligibility as a result of § 31 (*a*).[5]

Commonwealth Bridge operates under a fixed appropriation

---

[4]Because St. 2009, c. 65, § 31 (§ 31), was part of an appropriations bill, it expired at the end of fiscal year 2010. An essentially identical act, St. 2010, c. 131, § 136, applies to fiscal year 2011. All references to § 31 should, hereinafter, be considered as referring to both acts.

[5]Commonwealth Bridge does not, therefore, serve as a State-funded alternative for aliens excluded from Commonwealth Care by operation of § 31 (*a*) because there is a subclass of aliens, included in the putative plaintiff class and seeking relief in this proceeding, who are eligible for neither program. Members of this group include those aliens whose income exceeded 300 per cent of the Federal poverty level prior to August 31, 2009, but since has declined as well as those individuals who either did not reside in the Commonwealth or failed to enroll in Commonwealth Care prior to August 31, 2009, but would presently be eligible but for their alienage. By way of example, certain aliens who are refugees and arrive in the Commonwealth today are permitted to join Commonwealth Care (see 8 U.S.C. § 1612[a][2][A]); aliens

and, like § 31 (*a*), will terminate if not renewed each fiscal year. Funding for the program is subject to increase depending on the availability of enhanced Federal Medicaid reimbursements under the American Recovery and Reinvestment Act or a similar provision. Whether participating in Commonwealth Care or Commonwealth Bridge, or receiving no subsidy at all, residents of the Commonwealth over age eighteen remain subject to the requirement that they "obtain and maintain creditable [health insurance] coverage so long as it is deemed affordable under the schedule set by the [Connector]." G. L. c. 111M, § 2 (*a*). The parties agree that, as a practical matter due to their income level, members of the plaintiff class would not be subject to the penalty.

On February 25, 2010, the plaintiffs filed an action in the county court alleging violation of their rights under both Federal law and the United States and Massachusetts Constitutions. The Connector removed the case to Federal District Court pursuant to 28 U.S.C. § 1441(b) (2006) as raising Federal questions. The plaintiffs then filed an amended complaint that mounts a facial challenge to § 31 under the Massachusetts Constitution, omits Federal law claims, and alleges discrimination "based solely on [the plaintiffs'] national origin." The plaintiffs moved for and were granted remand of the case to the county court. On remand the plaintiffs requested that the entire case be reserved and reported to this court, but the single justice instead determined to reserve and report the four questions set forth above. The Commonwealth was allowed to intervene and present argument as a defendant.[6]

## I

*Question 1*: Does the protection against discrimination on the basis of "national origin," as enumerated in art. 106 of the

enrolled in Commonwealth Care prior to August 31, 2009, are eligible for Commonwealth Bridge (see § 31 [*b*]); and federally ineligible aliens arriving in the Commonwealth today are eligible for neither benefit (see § 31 [*a*]).

[6]We acknowledge the amicus briefs submitted by the American Civil Liberties Union of Massachusetts; Asian Pacific American Legal Center, Asian American Justice Center, and Asian American Institute; Irish Immigration Center; and Massachusetts Law Reform Institute, Health Care for All, and Massachusetts Immigrant and Refugee Advocacy Coalition.

Amendments to the Massachusetts Constitution, include protection against discrimination on the basis of alienage, i.e., one's immigration status?

Article 106 was adopted in 1976 and annulled art. 1 of the Massachusetts Declaration of Rights, inserting in its place the following declaration:

> "All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

This court traditionally has located a right to equal protection under art. 1 and, thus, under its successor art. 106. See, e.g., *Commonwealth* v. *Weston W.*, 455 Mass. 24, 30 n.8 (2009) (equal protection under art. 1); *Commonwealth* v. *Franklin Fruit Co.*, 388 Mass. 228, 229-230 (1983) (equal protection under arts. 1 and 10 of Massachusetts Declaration of Rights); *Connor* v. *Metropolitan Dist. Water Supply Comm'n*, 314 Mass. 33, 37-38 (1943) (equal protection under arts. 1, 6, 7, and 10 of Massachusetts Declaration of Rights). Because we address the broader question of equal protection in answer to reported Question 3, we consider Question 1 as requiring consideration only of the final sentence of art. 106.

We previously have held that "[t]he classifications set forth in art. 106 [sex, race, color, creed, or national origin] . . . are subjected to the strictest judicial scrutiny." *Commonwealth* v. *King*, 374 Mass. 5, 21 (1977) (*King*). Effectively, art. 106 removes the first step — determination whether a classification is suspect — from equal protection analysis and mandates strict scrutiny of the enumerated classifications. *Id.* Because art. 106 acts to channel the discretion of the courts with respect to the enumerated classes, the policy considerations that ordinarily illuminate equal protection analysis are not relevant to interpretation of art. 106. If a class is not addressed by art. 106 it does not follow that strict scrutiny is inappropriate but merely that

there is no express constitutional mandate that such scrutiny be applied.

Alienage is obviously not among the specifically enumerated classifications of art. 106. The plaintiffs argue with emphasis, however, that because *"all* aliens, without exception, have a national origin outside of the United States," discrimination on the basis of alienage is necessarily discrimination on the basis of national origin.[7] This argument fails because its general premise, that aliens may not trace their national origins to the United States, is incorrect.

"The term 'national origin' on its face refers to the country where a person was born or, more broadly, the country from which his or her ancestors came."[8] *Espinoza* v. *Farah Mfg. Co.,* 414 U.S. 86, 88 (1973) (*Espinoza*). In contrast, an alien is "a person who was born outside the jurisdiction of the United States, who is subject to some foreign government, and who has not been naturalized under U.S. law." Black's Law Dictionary 84 (9th ed. 2009). Cf. Black's Law Dictionary 95 (rev. 4th ed. 1968) (defining "alien" as "[a] foreigner; one born abroad," "a person who owes allegiance to a foreign government," and "[i]n this country, a person born outside of the United States and unnaturalized under our Constitution and laws"). The mere fact that the United States is a nation with a rich history of immigration does not mean that the United States lacks emigrants

---

[7] We note that this theory was advanced in *Espinoza* v. *Farah Mfg. Co.,* 414 U.S. 86 (1973) (*Espinoza*). In that case it was argued that Title VII of the Civil Rights Act of 1964 prohibited discrimination on the basis of citizenship because "discrimination on the basis of citizenship has the effect of discriminating on the basis of national origin." *Id.* at 92, quoting 29 C.F.R. § 1606.1(d) (1972), interpreting the phrase "national origin." The United States Supreme Court declined to defer to the Equal Employment Opportunity Commission regulation, determining that "there are 'compelling indications that it is wrong.' " *Id.* at 94-95, quoting *Red Lion Broadcasting Co.* v. *FCC,* 395 U.S. 367, 381 (1969).

[8] This court has not interpreted "national origin" so narrowly as to provide protections only to individuals who were born outside the United States. See, e.g., *Commonwealth* v. *Carleton,* 418 Mass. 773, 775 (1994) (finding discrimination on basis of "ethnicity" when considering prosecutor's peremptory challenges of jurors with "Irish-sounding surnames"). See also *Espinoza, supra* at 88 (noting that words "national origin" and "ancest[ry]" were equated by drafters of Title VII of Civil Rights Act of 1964; *Oyama* v. *California,* 332 U.S. 633, 640 (1948) (discrimination against citizen due to father's Japanese birth violates equal protection).

and the attendant possibility that aliens will have familial and cultural roots in the United States.[9] See 8 U.S.C. §§ 1401(g), 1409, 1433 (2006) (circumstances in which foreign-born child of United States national also may be citizen of United States or receive expedited naturalization).

In addition, an individual may cease to be an alien as a result of naturalization while retaining his or her national origin. See 8 U.S.C. §§ 1421-1458 (2006). Conversely, an American citizen, who may have national origins both in the United States and elsewhere, may lose his or her citizenship while retaining those national origins. 8 U.S.C. § 1481(a) (2006). Classification on the basis of alienage is not, therefore, a mere subset of classification on the basis of national origin, and discrimination against aliens is not inherently and necessarily discrimination against persons with national origins outside the United States. *Espinoza, supra* at 88 n.2 (finding "a general understanding that the term 'national origin' does not embrace a requirement of United States citizenship"). The plaintiffs make no other substantive arguments regarding art. 106.[10]

---

[9]The most recognizable such individual may be Winston Churchill, son of an English father and American mother, who was an alien with a national origin in the United States until 1963 when he was declared an honorary citizen of the United States by act of Congress. See Pub. L. No. 88-6, 77 Stat. 5 (1963).

[10]It is argued in certain of the amicus briefs that this court previously has included alienage within its formulation of the classes protected within art. 106 of the Amendments to the Massachusetts Constitution. In several instances this does not appear to have been the case. See *Doe* v. *Commissioner of Transitional Assistance*, 437 Mass. 521 (2002) (discussing equal protection without mention of art. 106); *Care & Protection of Rebecca*, 419 Mass. 67, 81 n.12 (1994) (addressing "equal protection" without reference to art. 106, citing *Commonwealth* v. *King*, 374 Mass. 5, 21 [1977] [discussing both Federal equal protection and art. 106]); *Murphy* v. *Commissioner of the Dep't of Indus. Accs.*, 415 Mass. 218, 226-227 (1993) (addressing equal protection clause of Federal Constitution); *Franklin* v. *Spadafora*, 388 Mass. 764, 774 n.16 (1983), quoting *New Orleans* v. *Dukes*, 427 U.S. 297, 303 (1976) (United States Supreme Court's interpretation of Federal Constitution). This court has twice, in noting the existence of an overlap between art. 106 and the Federal equal protection clause, included citation to *Graham* v. *Richardson*, 403 U.S. 365 (1971) (*Graham*), where the United States Supreme Court held alienage to be a suspect classification. See *Commonwealth* v. *King, supra*; *Opinion of the Justices*, 373 Mass. 883, 886 (1977). Alienage was not before the court in either case and the citation to *Graham* is better understood as a reference to the types of classes subject to strict scrutiny than as an offhand incorporation of alienage into art. 106.

The single justice, however, did not inquire as to the identity of "alienage" and "national origin" but rather as to the protections provided by art. 106. Full constitutional analysis is therefore required. "In determining the meaning of a constitutional provision, we look to the language and structure of the provision, so that it is 'construed so as to accomplish a reasonable result and to achieve its dominating purpose.' " *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 558 (1993) (*McDuffy*), quoting *Lincoln* v. *Secretary of the Commonwealth*, 326 Mass. 313, 317 (1950). We bear in mind that the Constitution "was written to be understood by the voters to whom it was submitted for approval" and that "[i]t is to be interpreted in the sense most obvious to the common intelligence. Its phrases are to be read and construed according to the familiar and approved usage of the language." *Buckley* v. *Secretary of the Commonwealth*, 371 Mass. 195, 199 (1976). "Our point of departure is the plain wording of art. [106] itself, which we construe 'in the light of the conditions under which it was framed, the ends designed to be accomplished, the benefits expected to be conferred, and the evils hoped to be remedied.' " *Carney* v. *Attorney Gen.*, 447 Mass. 218, 224 (2006), quoting *Loring* v. *Young*, 239 Mass. 349, 372 (1921).

Article 106 differs from art. 1 in two ways: (i) by changing the second word ("men") from the masculine to the gender neutral ("people"); and (ii) by inserting the final sentence that guarantees equality under the law regardless of sex, race, color, creed, or national origin. Prior to the adoption of art. 106 the Federal Constitution had been interpreted to require strict scrutiny of racial, ethnic, religious, and alienage based discrimination. *King, supra*, citing *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972) (religious distinctions); *Graham* v. *Richardson*, 403 U.S. 365 (1971) (*Graham*) (alienage); *Loving* v. *Virginia*, 388 U.S. 1 (1967) (race); *Oyama* v. *California*, 332 U.S. 633 (1948) (national origin). In 1976, however, gender had not been recognized as an inherently suspect classification requiring strict scrutiny. See *Stanton* v. *Stanton*, 421 U.S. 7, 13 (1975) ("We find it unnecessary in this case to decide whether a classification based on sex is inherently suspect"). Cf. *Nevada Dep't of Human Resources* v. *Hibbs*, 538 U.S. 721, 730 (2003) ("measures that differentiate

on the basis of gender warrant heightened [as opposed to strict] scrutiny"). The language and structure of art. 106, as well as the conditions in which it was framed, therefore indicate that the dominating purpose of art. 106 was to express "that the people of Massachusetts view sex discrimination with the same vigorous disapproval as they view racial, ethnic, and religious discrimination." *King, supra.* See *McDuffy, supra.* Accordingly, this court, in *King, supra,* interpreted art. 106 as requiring strict scrutiny of gender classifications.

Looking beyond its dominating purpose, the structure, plain wording, and conditions in which art. 106 was framed do not suggest that it was intended to address alienage classifications. See *Carney* v. *Attorney Gen., supra* at 224; *McDuffy, supra.* Article 106 lists a number of classifications recognized as suspect in 1976 but omits mention of alienage classifications although, at the time, they were similarly recognized in equal protection jurisprudence. See *Graham, supra* (alienage is suspect classification for equal protection purposes); *post* at 691-692 (Duffly, J., concurring in part and dissenting in part) (citing cases regarding national origin and alienage). As discussed above, "national origin" and "alienage" are distinct categories separated by the concept of citizenship, which is not an obscure, hollow, or narrowly technical notion, but rather one with deep roots in this nation's tradition and heritage. See *Mathews* v. *Diaz,* 426 U.S. 67, 78 (1976) ("a host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other"). It would twist the "familiar and approved usage of the language," *Buckley* v. *Secretary of the Commonwealth,* 371 Mass. 195, 199 (1976), to treat the words as having identical meanings and to hold that both words were intended when only one was used. See *Espinoza, supra* at 94-95 (refusing to defer to EEOC guideline that conflated terms because "there are 'compelling indications that it is wrong' ").

We also note that the very adoption of art. 106 displays a sophisticated public understanding of the development of equal protection jurisprudence as of 1976. At the time of its enactment, art. 106 was popularly known as the "Equal Rights Amendment" — a soubriquet baldly stating that, as interpreted by the

court prior to 1976, certain rights were not theretofore equally respected under the Massachusetts Constitution. By enacting art. 106, the voters demonstrated their awareness that different classifications are subject to varying levels of judicial review and their conclusion that rational basis review was not adequately addressing the problem of gender discrimination. The voters thus acted with respect to gender classifications and reaffirmed prior jurisprudence with regard to race, color, creed, and national origin classifications. See art. 106. The voters did not act with respect to alienage classifications though alienage equal protection jurisprudence had developed by 1976 and its distinction from national origin discrimination was recognized.[11] See *Graham, supra* (alienage); *Oyama* v. *California*, 332 U.S. 633 (1948) (national origin). The voters chose to include only national origin classifications in art. 106 and we will not assume that the omission of alienage classifications was driven by ignorance or mistake rather than conscious choice. Accordingly, we answer the first reported question in the negative.

## II

*Question 2*: If the answer to Question 1 is negative, does any other provision of the Massachusetts Constitution provide special protection against discrimination on the basis of alienage beyond the general contours of equal protection?

Equal protection of the laws is a concept that permeates the Massachusetts Constitution. The broadest statement of equal

---

[11]We disagree with Justice Duffly regarding the first reported question in part because we reach a different conclusion as to the development of "national origin" precedent prior to 1976. Crucially, Justice Duffly notes that the 1964 Civil Rights Act (Act) was the "template for the enumerated protected classes in [art. 106]." *Post* at 692. In 1973, however, a majority of the United States Supreme Court held that the prohibition on national origin discrimination contained in the 1964 Civil Rights Act did not include a prohibition on alienage discrimination. *Espinoza, supra* at 95 (aliens, like all residents, are protected under Act from discrimination on basis of race, color, religion, sex, or national origin but "nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage"). Cf. *post* at 691, citing *Espinoza, supra* at 96–97 (Douglas, J., dissenting). Where the template for art. 106 had been held to exclude protections against alienage classifications in 1973, we cannot hold that the drafters and voters understood art. 106 to include such protections in 1976.

protection is contained in arts. 1 and 106, which state that "[a]ll
[people] are born free and equal and have certain natural, es-
sential, and unalienable rights . . . ." Similar guarantees of
equal protection are also found in art. 6 ("No man, nor corpora-
tion, or association of men, have any other title to obtain
advantages, or particular and exclusive privileges, distinct from
those of the community . . ."), art. 7 ("Government is insti-
tuted for the common good; for the protection, safety, prosper-
ity, and happiness of the people; and not for the profit, honor, or
private interest of any one man, family or class of men . . ."),
and art. 10 ("Each individual of the society has a right to be
protected by it in the enjoyment of his life, liberty and property,
according to standing laws"). The plaintiffs do not argue that
any other provision of the Massachusetts Constitution provides
special protection against discrimination on the basis of alien-
age beyond the general contours of equal protection. Accord-
ingly any such claim has been waived, and we need not answer
Question 2. For the sole purpose of addressing Question 3,
which we understand as requesting guidance if the answers to
Questions 1 and 2 are not in the affirmative, we treat this result
as an answer in the negative.

### III

*Question 3*: If the answers to Question 1 and to Question 2
are negative, should a State classification based on alienage be
subjected to a "rational basis" standard of review under the
Massachusetts Constitution to determine whether there is a
rational relationship between the disparity of treatment between
citizens and aliens and some legitimate governmental purpose?[12]

Where a statute either burdens the exercise of a fundamental
right protected by our State Constitution, or discriminates on

---

[12]In this action the plaintiffs mount a facial challenge to § 31, asserting that
the statute "terminated the[ir] Commonwealth Care health coverage . . .
solely because they are legal immigrants." The complaint further asserts,
however, that § 31 "denies them access to a state health care program based
solely on their national origin." The third reported question resolves the
ambiguity by assuming that we are confronted with a classification based
exclusively on alienage. We focus our analysis on this classification but,
because the complaint may implicate both classifications, we also address
national origin classification to the extent it is relevant.

the basis of a suspect classification, the statute is subject to strict judicial scrutiny. See *Blixt* v. *Blixt*, 437 Mass. 649, 655-656 (2002), cert. denied, 537 U.S. 1189 (2003) (fundamental right); *Lowell* v. *Kowalski*, 380 Mass. 663, 666 (1980) (suspect classification). See also *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 330 (2003). All other statutes, which neither burden a fundamental right nor discriminate on the basis of a suspect classification, are subject to a rational basis level of judicial scrutiny. See *id.*; *English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423, 428 (1989), cert. denied, 493 U.S. 1056 (1990). For equal protection purposes, "[t]he rational basis test 'includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class.' " *Id.* at 429, quoting *Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 452 (1985) (Stevens, J., concurring). In contrast, "[t]o pass the strict scrutiny standard, [a State action] must be narrowly tailored to further a legitimate and compelling governmental interest and must be the least restrictive means available to vindicate that interest." *Commonwealth* v. *Weston W.*, 455 Mass. 24, 35 (2009).

The plaintiffs assert that aliens are a "discrete and insular" minority such that classification on the basis of alienage is suspect and State action discriminating against them must be subject to strict scrutiny.[13] The Connector and the Commonwealth argue that rational basis scrutiny is appropriate either because of the nature of the Commonwealth Care program or because § 31 adopts Federal classifications. We begin our analysis by reviewing our decision most nearly on point, *Doe* v. *Commissioner of Transitional Assistance*, 437 Mass. 521 (2002) (*Doe*).

In *Doe*, we considered a similar equal protection claim where the Commonwealth excluded federally ineligible aliens from a jointly funded program and established a parallel State program

---

[13]The plaintiffs do not allege that exclusion from Commonwealth Care burdens a fundamental right, so that argument is waived. In its amicus brief, the American Civil Liberties Union of Massachusetts does argue that "health care is an important if not a fundamental right." "An amicus may not argue issues not raised by the parties," so we decline to consider the question. *Robinson* v. *State Ballot Law Comm'n*, 432 Mass. 145, 147 n.4 (2000).

with a different durational residency requirement.[14] *Id.* at 522-523, 527. St. 1997, c. 43, § 210 (*a*)-(*c*). In determining the appropriate level of review, we noted that "[i]t is the general rule that State laws that discriminate against legal immigrants in the distribution of economic benefits are subject to strict scrutiny." *Id.* at 525-526. See *Graham, supra* at 375-376. Commonwealth Care is an economic benefit and § 31 may discriminate against aliens so strict scrutiny is presumptively applicable unless some exception applies.

We found such an exception in *Doe*, where we acknowledged congressional authority to "establish uniform national guidelines and policies dictating how States are to regulate and legislate issues relating to aliens."[15] *Doe, supra* at 526. In light of this authority, we then held that the "general rule does not apply . . . to State laws that merely adopt uniform Federal guidelines regarding the eligibility of aliens for benefits." *Id.* We thus concluded that "it would make no sense to say that Congress has plenary power to legislate national immigration policies and guidelines subject to a deferential (rational basis) standard of review, and then to hold that the equal protection clause of the

---

[14]The statute at issue in *Doe* v. *Commissioner of Transitional Assistance*, 437 Mass. 521 (2002) (*Doe*), involved two separate programs, and we identified two different classifications. We determined that the first program, transitional aid to families with dependent children (TAFDC), involved a classification between citizens and aliens pursuant to the adoption of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) eligibility standards by St. 1997, c. 43, § 210 (*a*). We applied rational basis analysis due to the State's decision to adopt PRWORA eligibility standards. *Doe, supra* at 527-528. The second program, established by St. 1997, c. 43, § 210 (*b*) and (*c*), was open only to aliens and distinguished between aliens residing in the Commonwealth for more or less than six months. We applied rational basis analysis because the classification identified was one based on duration of residency. *Doe, supra* at 534. Our opinion did not analyze the fact that citizens participating in TAFDC were immediately eligible for benefits while aliens participating in the parallel program were required to wait six months. But see *post* at 684-685 (Gants, J., concurring in part and dissenting in part) ("Benefits under the TAFDC program were thus available to citizens who had resided in the Commonwealth for less than six months but not to similarly situated aliens, and the issue in *Doe* was whether rational basis or strict scrutiny applied to this classification").

[15]Parenthetically, such congressional action would invoke the supremacy clause, require the Commonwealth to adopt Federal guidelines, and thus excuse the Commonwealth's action from traditional equal protection analysis.

Constitution restrains States from adhering to or adopting those national policies and guidelines because their actions are subject to a higher (strict scrutiny) standard of review." *Id.* at 526-527. In reaching our conclusion in *Doe*, however, we did not bridge the analytical gap between congressional action "dictating how States are to regulate and legislate issues relating to aliens" and the State's responsibilities where Congress enacts a noncompulsory rule and the Commonwealth voluntarily "adopt[s] those national policies and guidelines." *Id.* at 526, 527. Neither we, nor Justice Gants, are able to do so here.[16]

It is undisputed that Congress enjoys the authority to discriminate on the basis of alienage, which authority, as demonstrated by PRWORA, largely permits it to abdicate the responsibility to provide aliens with equal protection of the laws.[17] See *Mathews* v. *Diaz*, 426 U.S. 67, 79-80 (1976). It is similarly

---

[16]Justice Gants does not enunciate a constitutional theory that explains why the State's decision to voluntarily adopt discriminatory eligibility requirements should be subject to rational basis review. Instead, he ignores the actual structure of Commonwealth Care, treats the reimbursement-based funding mechanism of Commonwealth Care as a fiction, and argues that in such a counterfactual circumstance the substantive relief sought by the plaintiffs would make no sense. See *post* at 686-688. We disagree with this analysis.

If the State operated a health insurance premium assistance program with nonsuspect eligibility classifications and the Federal government operated a parallel program dispensing a "top up" benefit in conformity with PRWORA, Justice Gants would be correct in observing that it "would make no sense" to require that the State "restore [to resident aliens] every dollar lost in Federal funding." *Post* at 687. That is not, however, the structure that actually exists.

Commonwealth Care is a State program that distributes a single benefit to eligible individuals. Pursuant to PRWORA, the Federal government has agreed to subsidize this benefit for some residents by reimbursing the Commonwealth on a discriminatory basis. The Commonwealth could have treated residents equally and allowed PRWORA to establish a wedge between nominal and effective rates of Federal reimbursement. In other words, the Commonwealth could have viewed PRWORA for what it is, an indirect means of reducing Federal financial support. See *post* at 684, 687. Instead, the Commonwealth chose to adopt the facially discriminatory PRWORA eligibility requirements, excluding a suspect class from an economic benefit but maximizing the effective rate of Federal reimbursement. See § 31. This is a State action that, in the absence of some exception rooted in constitutional principles rather than policy concerns, is subject to strict scrutiny for the reasons set forth herein. Though the consequence of applying this standard to Commonwealth Care or other programs may be fiscally painful, this is not a result that "makes no sense" from a constitutional or policy perspective. See *post* at 685-688.

[17]Although it is clearly established, the precise source of Congress's plenary

undisputed that the General Court does not enjoy any analogous power. See *Graham, supra* at 372. Thus, the standard of review applicable to a statute depends on which government's actions are under review. Where the Federal government has made a binding decision regarding the treatment of aliens, that decision will be reviewed according to the standards applicable to the Federal government even though the immediate actor may be a State government. *Mathews* v. *Diaz, supra.* In comparison, where the State acts on its own authority, it cannot shelter behind the existence of Congress's plenary authority, and its actions are subject to strict scrutiny review. *Graham, supra.* It is irrelevant that the same result could have been imposed on the State by the Federal government pursuant to the supremacy clause. See *Shapiro* v. *Thompson,* 394 U.S. 618, 641 (1969) (although possessing plenary authority over immigration and naturalization, "Congress may not authorize the States to violate the Equal Protection Clause"); *Barannikova* v. *Greenwich,* 229 Conn. 664, 683 (1994) ("The fact that a state may act within a given realm provided it does not conflict with federal [alienage] legislation, does not also imply that when so acting it may make invidious distinctions without regard to the constitutional equal protection guarantee").

Here, no party has argued that the Commonwealth was required to apply PRWORA's eligibility classification to Commonwealth Care. Indeed, for three years after Massachusetts established the program, Commonwealth Care provided benefits to qualified aliens without any suggestion that such benefits were in violation of or inconsistent with PRWORA. This was permissible because PRWORA declares that, so long as no Federal funds

---

authority over the entrance and expulsion of aliens, and thus the conditions of their residency, is unclear. See United States Const., art. I, § 8, cl. 4 ("The congress shall have power . . . to establish a uniform rule of naturalization . . . throughout the United States"); *Mathews* v. *Diaz,* 426 U.S. 67, 81 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); *Fong Yue Ting* v. *United States,* 149 U.S. 698, 711, 713 (1893) ("The right to exclude or expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, [is] an inherent and inalienable right of every sovereign," and this sovereign power "is vested in the political departments of the [Federal] government, and is to be regulated by treaty or by act of Congress").

contribute to such benefits, Congress is indifferent to the use of State funds in providing public benefits to aliens qualified to reside in the Commonwealth but ineligible for Federal benefits. Specifically, "a State is authorized to determine the eligibility for any State public benefits of an alien who is a qualified alien" (8 U.S.C. § 1622); "a State is authorized to prohibit or otherwise limit or restrict the eligibility of aliens or classes of aliens for programs of general cash public assistance furnished under the law of the State" (8 U.S.C. § 1624); and "[a] State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit" if the State "affirmatively provides for such eligibility" subsequent to the enactment of PRWORA (8 U.S.C. § 1621[d]).[18]

Indeed, far from considering PRWORA to be a mandate to the States, in the statute's "statements of national policy" Congress seeks to tip the scales of equal protection analysis where "a State . . . *chooses* to follow the Federal classification in determining the eligibility of [federally ineligible] aliens for public assistance" (emphasis added). 8 U.S.C. § 1601(7). PRWORA, therefore, does not require that States apply Federal

---

[18]Justice Gants expresses the concern that, if strict scrutiny is applied, a subsequent ruling on the merits may "nullify[] the effect of [PRWORA] except to shift expenditures from the Federal government to the State." *Post* at 686. This shifting of burdens, however, appears to be precisely the effect that Congress intended.

As discussed above, PRWORA permits the States to adopt some, all, or none of the eligibility requirements established in PRWORA as long as no benefits are paid for from the Federal fisc. See 8 U.S.C. §§ 1601(7), 1621(d), 1622, 1624. The statute expresses a preference for "[s]elf-sufficiency" but does not suggest a congressional preference that benefits not be provided to qualified aliens. See 8 U.S.C. § 1601. Indeed, the statute does not even express such a preference regarding aliens who, unlike members of the plaintiff class, are "not lawfully present in the United States." See 8 U.S.C. § 1621(d).

PRWORA states that aliens "not lawfully present" are prohibited from receiving public benefits (State or Federal) but provides, in the same section, that States may through "affirmative[] provi[sion]" restore to such aliens any benefits lost as a result of PRWORA. 8 U.S.C. § 1621(d). Even regarding aliens "not lawfully present," therefore, Congress's sole interest is in the source of funds for the benefits and not in the provision or denial of the benefits themselves. *Id.* Justice Gants does not explain why Congress may have been concerned about "nullifying the effect of [PRWORA]," with regard to qualified aliens, *post* at 686, when 8 U.S.C. § 1621(d) indicates that Congress is pleased for States to do so regarding nonqualified aliens.

eligibility requirements but instead merely declares that Federal policy will not be thwarted if States decide to discriminate against qualified aliens. See 8 U.S.C. §§ 1622, 1624; *post* at 688-689 (Gants, J., concurring in part and dissenting in part).

In the context of Commonwealth Care, PRWORA is thus a statement by Congress that the Federal government will be subsidizing the State's provision of benefits to some residents (citizens and eligible aliens) but not to others (federally ineligible aliens). This is a financial impediment to State action but not a mandate under the supremacy clause that might require the application of rational basis review.[19] Where the State is left with a range of options including discriminatory and nondiscriminatory policies, its selection amongst those options must be reviewed under the standards applicable to the State and not those applicable to Congress. Settled equal protection law therefore requires that § 31 (*a*) be reviewed under strict scrutiny. See *Commonwealth* v. *Acen*, 396 Mass. 472, 481 (1986).

The Connector requests that we revisit this general rule and instead apply the same rational basis review appropriate when aliens are excluded from political functions (see *Bernal* v. *Fainter*, 467 U.S. 216, 220 [1984]) to every alienage classification. Aliens, standing by definition outside the body politic and yet subject to its laws, are a prototypical example of the " 'discrete

---

[19]Justice Gants agrees, noting that PRWORA "allowed States to make their own determinations about alien eligibility for State benefits" and that PRWORA does not prohibit the provision of benefits, it merely "increased the financial burden of providing benefits to noncitizens." *Post* at 684. We thus can identify no principled basis for concluding that increased expense somehow deprives the Commonwealth of autonomy and renders § 31 something other than an action undertaken solely by the Commonwealth. Justice Cardozo expressed the point forcefully and eloquently in refusing to find that the Social Security Act coerced State action:

"[T]o hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such a doctrine is the acceptance of a philosophical determinism by which choice becomes impossible. Till now the law has been guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of its problems. The wisdom of the hypothesis has illustration in this case. Nothing in the case suggests the exertion of a power akin to undue influence, if we assume that such a concept can ever be applied with fitness to the relations between state and nation."

*Steward Mach. Co.* v. *Davis*, 301 U.S. 548, 589-590 (1937).

and insular' minority."[20] See *Graham, supra* at 372, 375-376. In light of their particularly vulnerable status, it thus remains necessary to exercise heightened vigilance to ensure that the full panoply of constitutional protections are afforded to the Commonwealth's resident aliens. We therefore decline to overturn the general rule applying strict scrutiny. See *Doe, supra* at 525-526; *Commonwealth* v. *Acen, supra.*

In reaching this conclusion we disagree with Justice Gants on a number of fundamental points. First, while we are acutely aware of the financial difficulties presently facing the Commonwealth, the fiscal consequences of any subsequent judgment on the merits cannot be permitted to intrude on consideration of the case before us. See *post* at 688. "[M]inorities rely on the independence of the courts to secure their constitutional rights against incursions of the majority, operating through the political branches of government." *Commonwealth* v. *O'Neal*, 369 Mass. 242, 271 (1975) (Tauro, C.J., concurring). If the political branches have violated the plaintiffs' right to equal protection of the laws by enacting § 31, then it may be our duty to say so in a future case, and it is not for us to consider now whether fiscal consequences favor tipping the standard of review toward one party or another. See art. 29 of the Declaration of Rights. The State was not required to establish the Commonwealth Care program, is under no obligation to continue it, and may expend as much or as little on the program as it wishes so long as benefits are distributed in a constitutionally acceptable manner. Our decision regarding the standard of review therefore has no binding effect on the Commonwealth's budget, and even if it

---

[20]Lack of the franchise is a substantial, although certainly not the sole, concern underlying the rule that classification on the basis of alienage is generally suspect. It is therefore of some interest as a historical matter that, at various times, a number of States extended suffrage to certain classes of aliens but since have withdrawn that right. See *Minor* v. *Happersett*, 88 U.S. (21 Wall.) 162, 177 (1874) ("citizenship has not in all cases been made a condition precedent to the enjoyment of the right of suffrage" and number of States permitted voting by "persons of foreign birth, who have declared their intention to become citizens"); Raskin, Legal Aliens, Local Citizens: The Historical, Constitutional, and Theoretical Meanings of Alien Suffrage, 141 U. Pa. L. Rev. 1391, 1397-1417 (1993) (describing growth and decline of alien suffrage in United States).

did, we would be precluded from considering that result in answering the reported question.

Second, we do not agree with Justice Gants's view that the scale of the inequality imposed by an invidious classification is relevant in considering the appropriate standard of review. See *post* at 680 ("strict scrutiny is the appropriate standard of review . . . only where the State's per capita expenditures for the plaintiff aliens are substantially less than . . . for similarly situated Commonwealth Care participants"). The point of the equal protection guarantee is not to ensure that facially discriminatory laws yield roughly equivalent outcomes or that, in singling out disadvantaged classes, the State subjects them to only mild inequality. Rather, the right to equal protection recognizes that the act of classification is itself invidious and is thus constitutionally acceptable only where it meets an exacting test. Whether § 31 results in a sharp reduction in benefits to some or all members of the plaintiff class therefore is irrelevant to the standard of review that is applicable.

Finally, we disagree with Justice Gants's position that strict scrutiny is unnecessary because "the Commonwealth [has not] use[d] the denial of Federal Medicaid funds [under PRWORA] as an excuse to put aliens in a worse position than they would have been had no Federal funding been available." *Post* at 689. As discussed in note 5, *supra*, qualified aliens residing in the Commonwealth who were not enrolled in Commonwealth Care prior to August 31, 2009, are not eligible to participate in either Commonwealth Care or Commonwealth Bridge. § 31 (*b*). Thus, a resident alien who failed to enroll before August 31, 2009, who moved to the Commonwealth after that date, or who became impoverished after that date will receive no health insurance premium assistance whatsoever. *Id.* This is a "worse position than they would have been had no Federal funding been available." *Post* at 689. This is precisely the situation in which Justice Gants states that strict scrutiny should apply.

Having addressed the question of alienage classification, we address the possibility that § 31 discriminates against the plaintiff class on the basis of national origin. As discussed above, alienage and national origin are not synonymous, and if a classification is based on national origin, the Declaration of Rights re-

quires that strict scrutiny apply. *Doe, supra* at 533 ("If [the] classification [between aliens] were a suspect one such as race, gender, or national origin [rather than duration of residency], we would apply a strict scrutiny analysis"). See *King, supra* at 21. We must, therefore, consider the nature of the PRWORA classifications that § 31 imports into Massachusetts law.

PRWORA does not extend Federal benefits to citizens while prohibiting all aliens from receiving similar assistance. Instead, PRWORA provides Federal benefits to "eligible" aliens and denies them to "ineligible" aliens. See 8 U.S.C. §§ 1611-1613. The class of federally "eligible" aliens includes those aliens meeting certain race, gender, national origin, and religion-neutral criteria such as being refugees, victims of domestic violence, veterans, or victims of severe forms of human trafficking. 8 U.S.C. §§ 1612, 1641. However, the category of "eligible" aliens also includes certain Cubans, Haitians, Amerasians, Native Americans who were born in Canada,[21] Filipino veterans, Hmong or Highland Lao veterans, and Iraqi or Afghan special immigrants while excluding similarly situated aliens from other countries. See *id.*; 8 C.F.R. § 204.4(a) (2010) (defining Amerasian status in terms of national origin rather than race). Federal benefits are thus available on a different basis to an individual having a national origin in Haiti than to a similarly situated individual having a national origin in the Dominican Republic, to a Native American born in Canada than to a Native American born in Mexico, and to the child of a service member whose mother is Korean than to a similarly situated child whose mother is German. See 8 U.S.C. §§ 1612, 1641; 8 C.F.R. § 204.4(a); *Oyama v. California*, 332 U.S. 633 (1948) (classification based on nation in which citizen's father was born overturned). PRWORA therefore classifies aliens, in part, on the basis of national origin, and by enacting § 31, the Commonwealth voluntarily adopted this national origin classification.

As discussed above, art. 106 removes the first step of equal protection analysis — determination whether a classification is suspect — from equal protection analysis and mandates strict

[21]The parties have stipulated that Commonwealth Care benefits are available to "certain Native Americans who were born in Canada or other territories outside of the United States."

scrutiny of the enumerated classifications whenever the Commonwealth establishes such categories.[22] See part I, *supra*. Because § 31 imports the eligibility criteria of PRWORA and because those eligibility criteria classify on the basis of national origin, § 31 must be subject to strict scrutiny review under art. 106.

The command of art. 106 is inapplicable only if, pursuant to the supremacy clause, Federal law permits the State no alternative but to adopt policies that classify individuals on the basis of national origin. No party argues, and Justice Gants does not assert, that PRWORA contains such a mandate. See *post* at 684. Further, the fact that the Federal government (on national origin grounds) is unwilling to shoulder a portion of the financial load of Commonwealth Care does not render the Commonwealth obligated to classify eligibility on the basis of national origin — it merely makes such a classification economically attractive to the State that is left carrying the entire burden.[23]

Where the Massachusetts Constitution looks on the PRWORA classification with "vigorous disapproval," strict scrutiny must be applied to the State's voluntary decision to apply such a classification to Commonwealth Care. See *King*, *supra* at 21. Because rational basis review is inappropriate in this case, we answer Question 3 in the negative.

---

[22]The contrary proposition is readily stretched to the absurd. If large remittances were to convince Congress that qualified aliens of Swedish origin can afford additional taxes, it might invoke its plenary authority to impose a one per cent surcharge on their Federal income taxes. Whatever the merits of the surcharge and its compliance with the United States Constitution, there is no question that, if the Commonwealth were to "adopt by reference" the Federal "Swede-tax," the Federal example and the mere existence of congressional authority over aliens would not excuse the State from compliance with art. 106.

[23]We express no opinion whether the Commonwealth's interest in maximizing the number of individuals insured through Commonwealth Care (G. L. c. 118H, § 2) is a legitimate and compelling State interest or whether the method adopted by § 31 (*a*) (exclusion of individuals for whom no Federal reimbursement is available) is narrowly tailored to achieve that interest. We do note, however, that the a principal purpose of PRWORA appears to be the shifting of financial burdens from the Federal government to the States and that 8 U.S.C. § 1601(7) suggests that the differing equal protection responsibilities of these levels of government do not appear to have passed Congress's notice.

## IV

*Question 4*: If the answer to either Question 1 or to Question 2 is affirmative, what level of judicial scrutiny should be applied to the classification contained in § 31 (*a*), especially in light of the character of the Commonwealth Care program and the nature of its funding mechanisms?

We have answered neither question in the affirmative. Based on our analysis of Question 3, we conclude that it is unnecessary to develop some level of intermediate scrutiny applicable to the classification contained in § 31 (*a*).

This matter is remanded to the county court for further proceedings consistent with this opinion.

*So ordered.*

GANTS, J. (concurring in part and dissenting in part, with whom Cordy, J., joins). I agree with the court that aliens are entitled to the equal protection of our laws, not because the prohibition against discrimination on the basis of national origin under art. 106 of the Amendments to the Massachusetts Constitution provides specific protection from discrimination on the basis of alienage, but because such protection is present under the penumbra of the obligations set forth in arts. 1, 6, 7, and 10 of the Declaration of Rights of the Massachusetts Constitution, which require the State to provide all people with the equal protection of our laws. The third certified question asks us to determine the standard of review that applies to the State's exclusion of the plaintiff aliens from the Commonwealth Care program, a program whose operation is heavily dependent on Federal reimbursements for which the plaintiff aliens are ineligible. The court has decided that, while Congress has made a constitutionally valid decision to deny Federal Medicaid funds to most categories of lawfully residing aliens, the Commonwealth most likely violates its equal protection obligations if it does not replace the lost Federal funds dollar-for-dollar with State revenues in order to include federally ineligible aliens in the

Commonwealth Care program.[1] As discussed below, I do not agree that the State's obligation to provide all people with the equal protection of its laws extends to require it to nullify the effects of Congress's lawful exercise of its plenary power, to replace the lost Federal dollars with State revenues, and to spend more than twice as much in State funds on health care coverage for the plaintiff aliens as it spends for the federally subsidized citizen and alien participants in Commonwealth Care. Because I believe that strict scrutiny is the appropriate standard of review to evaluate a State's alienage classification only where the State's per capita expenditures for the plaintiff aliens are substantially less than the per capita amount contributed by the *State* for similarly situated Commonwealth Care participants, and because the limited record in this case does not yet demonstrate that the plaintiff aliens are suffering discrimination in the expenditure of funds derived from State revenues, I respectfully dissent from the court's holding as to Question 3.[2]

It has long been recognized that aliens within our jurisdiction are entitled to the equal protection of our laws. See *Plyler* v. *Doe*, 457 U.S. 202, 210-212 (1982); *Mathews* v. *Diaz*, 426 U.S. 67, 77 (1976) (*Mathews*); *Yick Wo* v. *Hopkins*, 118 U.S. 356, 369 (1886); *Doe* v. *Commissioner of Transitional Assistance*, 437 Mass. 521, 525 (2002) (*Doe*). This case requires us to determine what these equal protection guarantees require of a State when the Federal government has exercised its plenary

---

[1]Without prejudging the results of the application of strict scrutiny to the specific facts of this case, I cannot ignore the reality that strict scrutiny presents a high hurdle for the Commonwealth and is generally "fatal in fact." *Regents of the Univ. of Cal.* v. *Bakke*, 438 U.S. 265, 362 (1978) (Brennan, J., concurring in the judgment in part and dissenting in part), quoting Gunther, The Supreme Court, 1971 Term — Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972). See *Dunn* v. *Blumstein*, 405 U.S. 330, 363-364 (1972) (Burger, C.J., dissenting) ("So far as I am aware, no state law has ever satisfied this seemingly insurmountable standard, and I doubt one ever will, for it demands nothing less than perfection").

[2]In the final paragraphs of its discussion of the third certified question, the court concludes that the classifications at issue also constitute national origin discrimination. Because the third certified question asks us to address the appropriate standard of review for the State's alienage classification, and not to determine whether any other classifications may also be at issue, I believe the court should not have addressed this question.

power over immigration to deny federally funded public benefits to most categories of lawfully admitted aliens. To answer this question, we must attempt to harmonize the decisions of the United States Supreme Court in *Graham* v. *Richardson*, 403 U.S. 365 (1971) (*Graham*), and *Mathews, supra,* both of which interpret the equal protection guarantees of the Fifth and Fourteenth Amendments to the United States Constitution.[3]

In *Graham, supra* at 374, the Supreme Court rejected efforts by Arizona and Pennsylvania to preserve State funds by excluding lawfully residing aliens from State welfare programs. Arizona's program provided benefits to United States citizens and to aliens that had resided in the United States for fifteen years. *Id.* at 367. Pennsylvania's program extended benefits to those qualifying for federally funded benefits, and to those who did not qualify for Federal benefits but were United States citizens. *Id.* at 368. The Court rejected the argument of the two States that each had a "special public interest" in "favoring its own citizens over aliens in the distribution of limited resources such as welfare benefits." *Id.* at 372. See *id.* at 374. Instead, the Court held that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny," because aliens are a "prime example of a 'discrete and insular' minority." *Id.* at 372, quoting *United States* v. *Carolene Prods. Co.,* 304 U.S. 144, 152 n.4 (1938). See *Nyquist* v. *Mauclet,* 432 U.S. 1, 7-8, 12 (1977) (applying strict scrutiny to strike down New York law restricting financial aid for higher education based on citizenship and intent to apply for citizenship); *Shapiro* v. *Thompson,* 394 U.S. 618, 633 (1969)

---

[3]Although the plaintiffs raise their challenge under our State Constitution, the right to equal protection under the Massachusetts Declaration of Rights as to questions of alienage has been deemed to be coextensive with the right to equal protection under the United States Constitution. See *Doe* v. *Commissioner of Transitional Assistance,* 437 Mass. 521, 525 (2002) (*Doe*). Thus, the question whether a State classification based on alienage should be subjected to strict scrutiny or rational basis (or another standard of review) is the same under the United States and Massachusetts Constitutions, and our analysis is guided largely by Federal case law discussing equal protection obligations under the Fifth and Fourteenth Amendments to the United States Constitution. See *id.*

("The saving of welfare costs cannot justify an otherwise invidious classification").[4]

In *Mathews*, *supra* at 82-84, the Supreme Court considered whether the Federal government constitutionally could do what the State governments were not permitted to do in *Graham*, and concluded that it could. The Court held constitutional a Federal law that excluded aliens from Medicare's supplemental medical insurance plan unless they were permanent residents who had lived in the United States for at least five years. *Id.* at 80, 82, 84. The Court declared:

> "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. The exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry. The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.' In particular, the fact that Congress has provided some welfare benefits for citizens does not require it to provide like benefits for *all aliens*" (emphasis in original).

*Id.* at 79-80. Relying on the plenary power of Congress to regulate the relationship between the United States and the aliens within its borders subject only to a "narrow standard of review," the Court deferred to the line drawn by Congress and found that

[4]The United States Supreme Court also concluded that the welfare laws at issue in Arizona and Pennsylvania unconstitutionally encroached on Federal authority to regulate the admission of aliens because their requirements would discourage entry or residence in a particular State by aliens whom the Federal government permitted to reside in the United States. *Graham* v. *Richardson*, 403 U.S. 365, 378-380 (1971). The Court declared: "State alien residency requirements that either deny welfare benefits to noncitizens or condition them on longtime residency, equate with the assertion of a right, inconsistent with federal policy, to deny entrance and abode. Since such laws encroach upon exclusive federal power, they are constitutionally impermissible." *Id.* at 380. See *Takahashi* v. *Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration . . ."). See also *Toll* v. *Moreno*, 458 U.S. 1, 12-13 (1982); *DeCanas* v. *Bica*, 424 U.S. 351, 358 n.6 (1976).

neither the requirement of permanent residency nor the durational residency requirement was "wholly irrational." *Id.* at 81-83. The Court was not explicit about the standard of review it applied, but its decision has been understood to dictate that alienage classifications made by the Federal government in the distribution of economic benefits are reviewed under rational basis. See *Chicago* v. *Shalala*, 189 F.3d 598, 604-605, 609 (7th Cir. 1999); *Rodriguez* v. *United States*, 169 F.3d 1342, 1350 (11th Cir. 1999); *Narenji* v. *Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979), cert. denied sub nom. *Confederation of Iranian Students* v. *Civiletti*, 446 U.S. 957 (1980).

The *Mathews* Court distinguished *Graham* by noting that the relationship between aliens and States is different from that between aliens and the Federal government. *Mathews*, *supra* at 84-85. A classification based on alienage is "a routine and normally legitimate part" of the Federal government's business, whereas a State would have "no apparent justification" to draw distinctions based on alienage. *Id.* at 85. See *Plyler* v. *Doe, supra* at 225 ("States enjoy no power with respect to the classification of aliens"). Thus, after *Graham* and *Mathews*, alienage-based eligibility limits for public benefits under Federal law are subject to rational basis analysis, but comparable eligibility limits based on alienage under State law are subject to strict scrutiny.[5]

In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, 110 Stat. 2105 (1996), codified at 8 U.S.C. §§ 1601 et seq. (2006), which severely restricted the eligibility of legal immigrants for federally funded public benefits. See 8 U.S.C. §§ 1612, 1613. Congress prefaced the section of PRWORA governing alien eligibility for benefits by stating that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601. Congress further declared it to be the continued policy of the United States that "aliens within the Nation's borders not depend on public resources . . .

---

[5]State laws that discriminate based on alienage in matters relating to self-government and the democratic process are reviewed under rational basis. See, e.g., *Foley* v. *Connelie*, 435 U.S. 291, 296 (1978) (upholding citizenship requirement for police officers).

but rather rely on their own capabilities and the resources of their families," and that "the availability of public benefits not constitute an incentive for immigration to the United States." *Id.* PRWORA prevented all but a few categories of aliens from receiving federally funded public benefits, such as Medicaid, within their first five years after being admitted to the United States in a status otherwise qualifying for federally funded benefits. See 8 U.S.C. §§ 1611-1613, 1641. At the same time, it allowed States to make their own determinations about alien eligibility for State benefits, subject to certain restrictions. See 8 U.S.C. §§ 1621-1624.

For States and localities, PRWORA's withdrawal of Federal funding for large groups of aliens increased the financial burden of providing benefits to noncitizens[6] and raised questions about the States' obligations to those that Congress had determined to be ineligible for Federal funds. See *Doe, supra* at 524. We first confronted these questions in *Doe, supra* at 522, which involved the federally subsidized transitional aid to families with dependent children (TAFDC) program. After PRWORA, large numbers of noncitizens could no longer receive Federal funding under this program and had to be removed from the TAFDC program so that the State could comply with the conditions of its Federal funding. *Id.* at 522 & n.4. See Doe *vs.* McIntire, Suffolk Superior Court No. 2000-03014 (Feb. 2, 2001). In response, the Massachusetts Legislature barred from the TAFDC program qualified aliens who were ineligible to receive federally funded benefits. *Doe, supra* at 523. The Legislature then established a new, supplemental program that was funded solely with State funds, provided benefits comparable to those provided under the TAFDC program, and was available only to qualified aliens who had resided in the Commonwealth for at least six months and who were not eligible to receive TAFDC benefits because of PRWORA. *Id.* Benefits under the TAFDC program were thus

---

[6]Some localities sued, unsuccessfully, to enjoin the restrictions in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, 110 Stat. 2105 (1996), codified at 8 U.S.C. §§ 1601 et seq. (2006), from taking effect. See *Chicago* v. *Shalala,* 189 F.3d 598, 600, 609 (7th Cir. 1999). See also *Abreu* v. *Callahan,* 971 F. Supp. 799, 806, 817-818 (S.D.N.Y. 1997) (noting PRWORA would shift "substantial" financial burden to New York City).

available to citizens who had resided in the Commonwealth for less than six months but not to similarly situated aliens, and the issue in *Doe* was whether rational basis or strict scrutiny applied to this classification. *Id.* at 525.

In *Doe*, we applied rational basis review to the provision barring ineligible qualified aliens from the TAFDC program, declaring that "it would make no sense to say that Congress has plenary power to legislate national immigration policies and guidelines subject to a deferential (rational basis) standard of review, and then to hold that the equal protection clause of the Constitution restrains States from adhering to or adopting those national policies and guidelines because their actions are subject to a higher (strict scrutiny) standard of review." *Id.* at 526-527. We then considered the statutory provisions that created a new program to provide federally ineligible aliens the same level of assistance as available under TAFDC, but excluded those who had resided in the Commonwealth for less than six months. *Id.* at 528. We noted that the parties did not dispute "that the Massachusetts Legislature was not required to establish the supplemental program," and that only qualified aliens were eligible for benefits under the supplemental program, so the Legislature, in establishing the program, was not discriminating against aliens and in favor of citizens. *Id.* Instead, we concluded that the discrimination at issue was not between citizens and qualified aliens, but between two subclasses of qualified aliens based on the length of their residency in Massachusetts, and held that this durational residency requirement was subject to rational basis analysis. *Id.* at 528, 533-534.[7]

In 2006, when Massachusetts created the Commonwealth Care program at issue in this case, St. 2006, c. 58, § 45 (effective Oct. 1, 2006), the Legislature initially chose to admit most categories of aliens into the program and to bear the considerable per capita burden of providing the full cost of coverage for federally ineligible aliens.[8] In 2009, however, the Legislature decided to bar from the Commonwealth Care program all aliens

---

[7] We were not asked to determine whether the provisions violated the right to travel pursuant to the Supreme Court's analysis in *Shapiro* v. *Thompson*, 394 U.S. 618 (1969). See *Doe, supra* at 528-529.

[8] The Federal government has generally provided a fifty per cent reimburse-

who were not eligible to receive Federal funds under PRWORA, and created a separate and more limited program, the Commonwealth Care Bridge, to provide medical care for the federally ineligible aliens who had previously been admitted to the Commonwealth Care program. St. 2009, c. 65, § 31 (§ 31).

While in *Doe* the plaintiffs did not address whether the Commonwealth had an obligation to create a supplemental program to provide benefits for qualified aliens who were forced out of the TAFDC program, the plaintiffs here contend that the Legislature has a constitutional obligation to keep qualified aliens in the Commonwealth Care program and to pay in State funds every Federal Medicaid dollar denied to these qualified aliens under PRWORA. In short, the plaintiffs contend that, where the Federal government has lawfully exercised its plenary power over immigration to deny federally funded Medicaid benefits to most categories of aliens, equal protection guarantees require the State to pay twice the State funds per capita for the health care of qualified aliens as it pays for the health care of citizens. Adopting the plaintiffs' constitutional argument would mean that, although Congress has the plenary power to deny public benefits to qualified aliens, the States are constitutionally required to use State funds to make up the difference (unless they can establish that their refusal to do so is narrowly tailored to further a compelling State interest), thereby nullifying the effect of the congressional decision except to shift expenditures from the Federal government to the State.[9]

I conclude, as we did in *Doe, supra* at 526, that such a result

ment of eligible expenditures for federally eligible individuals. Because of additional Medicaid funding available pursuant to the American Recovery and Reinvestment Act of 2009, the reimbursement rate for Commonwealth Care expenditures in fiscal year 2010 is 61.59 per cent.

[9]Contrary to the court's assertion, in enacting PRWORA, Congress clearly did not intend merely to shift the burden of funding public benefits for noncitizens to the States rather than the Federal government. See *ante* at 673 n.18. Congress aimed to promote "[s]elf-sufficiency" and expressed its desire that aliens in the United States "rely on their own capabilities and the resources of their families, their sponsors, and private organizations" and "not depend on public resources," such that "the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601. By allowing States to use State funds to provide public benefits to lawfully present aliens who were denied Federal funding, 8 U.S.C. § 1622, PRWORA reflects a compromise between the expressed goal of promoting alien self-sufficiency,

"would make no sense." It is inconsistent with *Mathews* to require the State to undo the effect of Congress's decision and replace the funds that Congress, under its plenary power over aliens, determined it would not provide. Thus, I would hold that where a Federal law that denies Federal monies for benefits for certain qualified aliens is constitutional, see *Mathews, supra,* and where a State merely declines to restore every dollar lost in Federal funding, rational basis review applies. "[T]he right to equal protection does not require the State to . . . guarantee equal outcomes . . . . Nor does it require the State to remediate the effects of PRWORA." *Khrapunskiy* v. *Doar,* 12 N.Y.3d 478, 489 (2009) (upholding State's removal of federally ineligible individuals from program that supplemented Federal Supplemental Security Income, and placement of these individuals in program providing partial benefits). See *Hong Pham* v. *Starkowski,* 300 Conn. 412, 431 (2011) (rejecting claim that equal protection clause requires State to use State funds to provide plaintiff aliens with equivalent level of benefits provided to citizens through Federal Medicaid program). The court's holding means that it is constitutional for the Federal government to deny Federal funds for welfare or medical benefits to

and the implicit recognition that individual States should be allowed to decide whether to allocate their own funds to provide public benefits to aliens. While it allowed States to make these choices, Congress plainly did not intend the result the court mandates, that is, that States be constitutionally *required* to allocate State funds to make up for the lost Federal funding in order to provide public benefits to federally ineligible qualified aliens on an equal basis with federally eligible citizens and aliens. See 8 U.S.C. § 1601(7).

The court fails to come to grips with this point. The court recognizes that, in enacting PRWORA, Congress gave States the choice whether to provide public benefits to federally ineligible aliens. *Ante* at 673 n.18. But it fails to recognize that, under the reasoning of its holding, which rests entirely on the court's interpretation of United States Supreme Court equal protection decisions, the States would not have this choice. All fifty States, including States that do not wish to provide public benefits to federally ineligible aliens, would be constitutionally mandated under the equal protection clause of the Fourteenth Amendment to provide the same benefits to federally ineligible aliens they now provide, with the help of Federal funds, to citizens (or demonstrate that their exclusion of these aliens is narrowly tailored to serve a compelling State interest). Consequently, under the court's holding, the statutory provisions in PRWORA that provide the States with this choice are merely an illusion, because that choice is eliminated constitutionally by the equal protection clause.

qualified aliens, but State governments are constitutionally required to make up the difference with State funds. I am not confident that the court has fully considered the legal implications (and the fiscal consequences) of the precedent it establishes today for the many other State programs that receive Federal funding that is limited on the basis of alienage.

In contrast with some courts, I do not reach this conclusion because of the provisions in PRWORA authorizing States to make choices about the allocation of benefits to aliens. 8 U.S.C. §§ 1612(b), 1622. See, e.g., *Soskin* v. *Reinertson*, 353 F.3d 1242, 1254-1255 (10th Cir. 2004). Congressional authorization is important to the extent that it defeats any argument that the Commonwealth encroaches on Federal authority by excluding the plaintiff aliens from Commonwealth Care. See *Graham*, *supra* at 379-380; note 4, *supra*. However, congressional authorization would be to no avail if the State were funding Commonwealth Care without Federal subsidy, and had singled out the plaintiffs and other similarly situated individuals for exclusion from the Commonwealth Care program because of their alienage. That case, quite different from this one, would be "the very paradigm so definitively addressed in *Graham* . . . a State-funded benefit program available to citizens but not available to aliens on the same terms." *Doe, supra* at 531. It is clear that "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *Graham, supra* at 382. See *Ehrlich* v. *Perez*, 394 Md. 691, 725 (2006). The key in this case is not that Congress has authorized States to deny State funds to aliens for most medical benefits, but that Congress, in the exercise of its plenary power over immigration, made the choice to cut off the Federal funds that the States otherwise could have used to help pay for the medical benefits of federally ineligible qualified aliens.

*Graham* and the long string of Supreme Court cases dealing with equal protection and alienage provide other important limitations on States' ability to discriminate on the basis of alienage. See, e.g., *Yick Wo* v. *Hopkins*, 118 U.S. 356 (1886). Thus, the mere use of a Federal classification coupled with a claim to be pursuing Federal policy objectives is insufficient to allow a State to make classifications based on alienage and

receive only rational basis review. See *Takahashi* v. *Fish & Game Comm'n*, 334 U.S. 410, 418, 420 (1948) (rejecting argument by California that denial of fishing licenses to those "ineligible for citizenship" was justified because State was following lead of Federal policy); *Barannikova* v. *Greenwich*, 229 Conn. 664, 676 (1994) (applying strict scrutiny to general assistance program that deemed income of alien's sponsor to be available to support alien; rejecting argument that rational basis should apply because statute paralleled scheme used in determining Federal benefit eligibility).

I also note that rational basis would not be the standard of review if the Commonwealth were to use the denial of Federal Medicaid funds for certain qualified aliens as an excuse to put aliens in a worse position than they would have been had no Federal funding been available, that is, if the State used the denial of Federal funding as a reason to deny these qualified aliens the *State* funds for medical care they would otherwise have received if they were citizens.[10] Similarly, rational basis review would not apply if the Commonwealth were to replace lost Federal funds with State funds for United States citizens for whom Federal reimbursement was unavailable, but not replace them for qualified aliens. Such a scheme would recall the Pennsylvania statute that was subjected to strict scrutiny and struck down as unconstitutional by the Supreme Court in *Graham*, *supra* at 368, 371, 376. See *Aliessa* v. *Novello*, 96 N.Y.2d 418, 424, 436 (2001) (where State had two components to its Medicaid system, one federally subsidized and one fully State funded, strict scrutiny applied to strike down use of PRWORA's alienage categories to limit alien access to *State* Medicaid).[11]

---

[10]Because the plaintiffs' argument is that they must be allowed to enroll in the more costly Commonwealth Care program, the record is not fully developed as to all State health programs that benefit federally ineligible aliens. On the limited record before us, I cannot conclude that the State's per capita expenditures for the plaintiff aliens are substantially less than the per capita amount contributed by the State for similarly situated Commonwealth Care participants. Assuming the court is correct that federally ineligible qualified aliens denied access to Commonwealth Bridge are not provided with alternative health coverage, see *ante* at 676, I agree that the Commonwealth's classification would provide them with less State funds for medical care than they would have received had they been citizens, and should be subject to strict scrutiny.

[11]The plaintiffs have implied that such line drawing is at work, and the

I conclude that the State's exclusion of the federally ineligible qualified aliens from Commonwealth Care is entitled to rational basis review if the State does nothing more than refuse to expend State monies to restore the Federal funds lost by Congress's constitutional exercise of its plenary power. The exclusion is subject to strict scrutiny only if the plaintiffs were to prove that the State is paying substantially less per capita in State monies for medical care for federally ineligible qualified aliens than for similarly situated Commonwealth Care participants. Because, on the limited record before us, the plaintiffs have failed to make this showing, I respectfully dissent from the court's holding as to Question 3.

DUFFLY, J. (concurring in part and dissenting in part). I respectfully dissent from the view expressed in the opinion of the court that the answer to the first reported question must be "No." That question asks whether "the protection against discrimination on the basis of 'national origin,' as enumerated in art. 106 of the Amendments to the Massachusetts Constitution, include[s] protection against discrimination on the basis of alienage, i.e., one's immigration status?" I concur in the court's opinion that the answer to the third question, "[s]hould a State classification based on alienage be subjected to a 'rational basis' standard of review under the Massachusetts Constitution?" is "No."

1. *Question 1.* In 1976, Massachusetts voters approved art. 106, amending art. 1 of the Declaration of Rights. See *Commonwealth* v. *King*, 374 Mass. 5, 15 n.8 (1977). Article 106, known as the equal rights amendment (ERA), changed the opening words of art. 1 from "All men" to "All people," thereby rendering it gender neutral, and inserted an equal protection clause: "Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin." "Alienage" does not appear among the list of protected classes. Nonetheless, the historic backdrop to the enactment of art. 106, as well as its legislative and referendum history, strongly suggest

---

defendants have acknowledged that a small number of citizens who are ineligible for Federal reimbursement are included in Commonwealth Care at the State's expense. However, too little information about these individuals and the reason for their inclusion in Commonwealth Care has been provided by the parties to allow this to be the basis of any ruling in this case.

that the amendment was intended to incorporate all classifications to which Federal constitutional protection had to that point been extended, as well as to enlarge the scope of State equal protection to include gender.

In the landscape of Federal constitutional law that existed at the time art. 106 was enacted, alienage was firmly established as a suspect classification closely intertwined with national origin classification under the Fourteenth Amendment to the United States Constitution.[1] See, e.g., *Espinoza* v. *Farah Mfg. Co.*, 414 U.S. 86, 96-97 (1973) (Douglas, J., dissenting) (noting that employer's policy of excluding aliens is de facto policy preferring those born in this country because "[a]lienage results from one condition only: being born outside the United States. Those born within the country are citizens from birth. . . . [D]iscrimination on the basis of alienage *always* has the effect of discrimination on the basis of national origin"); *Takahashi* v. *Fish & Game Comm'n*, 334 U.S. 410, 420 (1948) (concluding that State law prohibiting issuance of commercial fishing license to any person ineligible for citizenship improperly discriminated against "lawful alien inhabitants, and particularly certain racial and color groups within this class of inhabitants"); *Oyama* v. *California*, 332 U.S. 633, 648 (1948) (Black, J., concurring) (noting that California's Alien Land Law, held to be unconstitutional on basis of national origin, in effect singled out aliens of Japanese ancestry "although the statute [did] not name the Japanese as such" and its terms also applied to "a comparatively small number of aliens from other countries"); *Truax* v. *Raich*, 239 U.S. 33, 35, 41 (1915) (Arizona statute that required certain employers to hire at least eighty per cent of workforce from "native-born" citizens held unconstitutional, noting that

---

[1]By 1976, Federal constitutional jurisprudence had long recognized that State laws discriminating on the basis of alienage were "inherently suspect and subject to close judicial scrutiny." *Graham* v. *Richardson*, 403 U.S. 365, 371, 372 (1971) ("It has long been settled . . . that the term 'person' in th[e] context [of the Fourteenth Amendment to the United States Constitution] encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside"). See *Sugarman* v. *Dougall*, 413 U.S. 634, 642 (1973) ("close judicial scrutiny" applicable to New York statute limiting eligibility for competitive class of civil service positions to citizens).

Fourteenth Amendment protection could not "be refused solely upon the ground of race or nationality").[2] Because of this intertwining of the concepts of national origin and alienage in Supreme Court jurisprudence, and because art. 106 includes national origin among its enumerated protected classes, it is therefore likely that the Legislature and Massachusetts voters intended to include alienage within the ambit of the term national origin as used in art. 106.

This view is supported by the genesis of the term "national origin" itself. The template for the enumerated protected classes in the Massachusetts ERA ("sex, race, color, creed or national origin"), as well as a number of other State ERAs passed in the 1970s,[3] appears to have been the 1964 Civil Rights Act. See 42 U.S.C. § 2000e-2(b) (2006) (prohibiting employment discrimination on basis of "race, color, religion, sex, or national

[2] See also Saucedo, National Origin, Immigrants, and the Workplace: The Employment Cases in Latinos and the Law and the Advocates' Perspective, 12 Harv. Latino L. Rev. 53, 55 (2009). The author focuses on employment cases to highlight inconsistent treatment among Latino workers, noting that "[i]n employment antidiscrimination law, courts have interpreted the national origin category narrowly, providing protection based on ethnicity without recognizing the extent to which alienage is a part of one's ethnic traits." *Id.* According to Professor Saucedo, this "affects Latinos differently than other minorities, in part because of the intertwined relationship between immigration status and national origin." *Id.*

[3] See, e.g., Alaska Const. art. I, § 3 (amendment effective Oct. 14, 1972) ("race, color, creed, sex or national origin"); N.H. Const. part 1, art. 2 (1974) ("race, creed, color, sex or national origin"); Tex. Const. art. 1, § 3a (adopted Nov. 7, 1972) ("sex, race, color, creed, or national origin"); Va. Const. art. I, § 11 (general revision ratified on Nov. 3, 1970) ("religious conviction, race, color, sex, or national origin").

Massachusetts was one of fourteen States that enacted ERAs in the 1970s as part of a nationwide campaign to ensure equal rights for women under the law. See Wharton, State Equal Rights Amendments Revisited: Evaluating Their Effectiveness in Advancing Protection Against Sex Discrimination, 36 Rutgers L.J. 1201, 1288-1293 (2005) (Wharton). The equal protection clauses in each of these State ERAs include either gender or sex among their protected classes, and eight of the fourteen include "national origin." Specific enumeration of protected classes varies from State to State. See, e.g., Conn. Const. art. I, § 20, as amended by art. V (adopted Nov. 27, 1974) ("religion, race, color, ancestry, national origin or sex"); Mont. Const. art. 2, § 4 (ratified June 6, 1972) ("race, color, sex, culture, social origin or condition, or political or religious ideas"). None contains the word "alienage." Wharton, *supra.* For the text of all State equal rights provisions, including the years in which they were passed, see *id.*

origin").[4] Legislative history as to the source and meaning of
the term "national origin" in the 1964 Civil Rights Act and its
predecessors further supports the interpretation that the term
incorporates the concept of alienage, which presupposes that a
person was born outside the United States.

The term "national origin" was originally employed in execu-
tive action and proposed legislation that sought the removal of
barriers to citizenship and elimination of national origin quotas
in immigration laws, as well the strengthening of civil rights
and prevention of employment discrimination based on race,
color, religion, or national origin. See, e.g., Executive Order
9346, 3 C.F.R. at 1280 (Supp. 1943); Public Papers of the
Presidents of the United States 1, 3 (Jan. 7, 1948). As there
employed, national origin meant the nation of one's birth.[5] The
several classifications reappear in the Civil Rights Act of 1957,
Pub. L. No. 83-315, 71 Stat. 634 (1957), and, with the addition
of "sex," were included in the Civil Rights Act of 1964, Pub.
L. No. 88-352, 78 Stat. 241, 254 (1964), which prohibits employ-
ment discrimination based on "race, color, religion, sex, or
national origin." 42 U.S.C. § 2000e-2(b). According to one

---

[4]As noted in the court's opinion, *ante* at 667 n.11, alienage is not among
the enumerated protected classes in the 1964 Civil Rights Act or its predecessors.
As Federal legislation, the Civil Rights Act would necessarily have distinguished
between discrimination based on national origin, which receives strict scrutiny
at the Federal level, and alienage, which receives only rational basis review.
Cf. *Hampton* v. *Mow Sun Wong*, 426 U.S. 88, 95 & 100-101 (1976); *Graham*
v. *Richardson*, 403 U.S. 365, 376-378 (1971). This observation does not alter
the fact that alienage and national origin are classifications that have histori-
cally been closely intertwined.

[5]In 1924, Congress passed legislation creating national origin quotas that
sought to limit immigration by aliens from nonwhite European countries. See
Immigration Act of 1924, c. 190, 43 Stat. 153, 155, 159. In 1948, President
Harry S Truman proposed passage of legislation that would strengthen civil
rights, prevent employment discrimination "based on race, color, religion or
national origin," and "remove the remaining racial or nationality barriers
which stand in the way of citizenship for some residents of our country."
Public Papers of the Presidents of the United States 121, 122-125 (Feb. 2,
1948). He also sought repeal of the national origins quotas in the immigration
laws. Public Papers of the Presidents of the United States 441, 442-443 (June
25, 1952). For more on the history of the term national origin and the efforts
of various Presidents to eliminate national origin discrimination prior to the
1964 Civil Rights Act, see Perea, Ethnicity and Prejudice: Reevaluating
"National Origin" Discrimination Under Title VII, 35 Wm. & Mary L. Rev.
805, 810-817 (1994) (Perea).

author, "[t]his context gave the term [national origin] its basic meaning, country of birth, at the time of the passage of the Civil Rights Act of 1964." Perea, Ethnicity and Prejudice: Reevaluating "National Origin" Discrimination Under Title VII, 35 Wm. & Mary L. Rev. 805, 811 (1994).

As reflected in the legislative history of the 1964 Civil Rights Act, legislators extended the definition of national origin to include the nation in which one's ancestors were born. See *Saint Francis College* v. *Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (in Title VII context, terms ancestry or ethnicity and "national origin — the 'country where a person was born,' " "overlap as a legal matter").[6]

In light of this Federal judicial and legislative context, it is likely that the definition of national origin appearing in art. 106 includes alienage; the history surrounding its enactment casts no doubt on this interpretation. The dominant purpose of art. 106, as reflected in its legislative history, was to expand guarantees of gender equality under the law while enshrining existing Federal equal protection guarantees within the Massachusetts Constitution.[7] Similarly, public debate over the ERA prior to its approval by referendum in 1976 supports the view that the voters of Massachusetts intended to incorporate existing Federal protec-

---

[6]See also Perea, *supra* at 820-821, 832 (in congressional debate leading up to Civil Rights Act, "national origin" was understood by legislators to mean "the nation of one's birth or the nations of birth of one's ancestors. This understanding of national origin merges one's national origin, or country of birth, with the national origin characteristics of one's ancestry").

[7]Article 106 originated as a legislative petition in the Massachusetts House of Representatives, see 1973 House Doc. No. 5313, and was one of many State ERAs in the 1970s that were aimed primarily at addressing the issue of gender equality. Wharton, *supra* at 1201-1202. The Legislature passed the proposed amendment overwhelmingly at the 1973 and 1975 constitutional conventions, and what little opposition there was appears to have focused on its gender-related social and legal impact. See 1973 Senate J. 2129-2133; 1975 Senate J. 1470-1477; State House News Service, May 7, 1975.

In 1975, the Legislature established a special commission tasked with studying the "reformulation of state laws" to bring them in compliance with the pending ERA. 1976 Senate Doc. No. 1689, at ii. Because classifications other than gender had already been "accord[ed] extensive protection against discrimination" under the United States Constitution, it was deemed unnecessary to review State statutes pertaining to these classifications because they would already have been brought into line with Fourteenth Amendment mandates. 1976 Senate Doc. No. 1689, at 1-2. See 1977 Senate Doc. No. 1500.

tions as well as gender equality guarantees into the State Constitution.[8] Significantly, cases from this court that discuss art. 106 shortly after its passage appear to assume that alienage was included within its protections. See *Commonwealth* v. *King*, 374 Mass. 5, 21 (1977) (classifications in art. 106, "with the exception of sex, are within the extensive protection of the Fourteenth Amendment," citing alienage as example of suspect classification under *Graham* v. *Richardson*, 403 U.S. 365 [1971]). See also *Care & Protection of Rebecca*, 419 Mass. 67, 81 n.12 (1994) (implying State Constitution would protect "classification based on race, alienage, national origin, or religion"); *Opinion of the Justices*, 373 Mass. 883, 886 (1977) (same).[9]

[8]The public debate over the proposed amendment also focused primarily on its potential gender-related effects, see Mass. Equal Rights Amendment, 1976 Ballot Questions (Massachusetts Taxpayers Foundation, Inc.), but the additional goal of enshrining equal protection guarantees for all people within the State Constitution was frequently cited by supporters of art. 106. Proponents noted that a State ERA would provide universal equal protections for all people and would ensure stronger and broader protections than antidiscrimination legislation; they also cited the important symbolic nature of passing a State ERA given that the State Constitution at that time contained no explicit guarantee of equality. See Some Questions and Answers on Equal Rights Amendment, Boston Globe, Oct. 26, 1976, at 13; Mass. Ballot Issues . . . 1 Equal Rights Amendment, Boston Globe, Oct. 20, 1976, at 22; ERA Fate Has National Import, Boston Globe, Oct. 24, 1976, at 29; Equal Rights Question Is a Symbol of Changing Times, Boston Globe, Oct. 29, 1976, at 21. Similarly, the guide sent to voters by the Secretary of the Commonwealth in 1976 described a vote in favor of the "Equal Rights" amendment as a "vote to add a specific guarantee of equality under the law to the state Constitution," while a "no" vote was "a vote to leave the state Constitution as it is." See Massachusetts Information for Voters 1976 at 3.

[9]Discrimination on the basis of ethnic characteristics was prohibited long before the passage of art. 106. See *Regents of the Univ. of Cal.* v. *Bakke*, 438 U.S. 265, 291-320 (1978) (discussing history of Federal anti-ethnic discrimination law). Ethnicity, like alienage, is often included within the meaning of national origin although the terms are not necessarily coterminous. See *Saint Francis College* v. *Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (agreeing that "one's ancestry — the ethnic group from which an individual and his or her ancestors are descended — is not necessarily the same as one's national origin"). Claims of discrimination based on national origin have been upheld where ethnicity was the appropriate classification. Thus, a claim of national origin discrimination under Title VII was held to state a cause of action by a Gypsy, although Gypsies are not defined as related to a particular country but as "various ethnic groups not originally from this land." *Janko* v. *Illinois State Toll Highway Auth.*, 704 F. Supp. 1531, 1531-1532 (N.D. Ill. 1989). See *Roach* v. *Dresser Indus. Valve & Instrument Div.*,

Based on the foregoing, I would conclude that art. 106 includes alienage within the meaning of national origin, and I would answer "Yes" to the first reported question.

2. *Question 3.* I agree with the court that the answer to the third question, "[s]hould a State classification based on alienage be subjected to a 'rational basis' standard of review under the Massachusetts Constitution?" is "No."

Federal reimbursement to the States is limited by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, 110 Stat. 2105 (1996), codified at 8 U.S.C. §§ 1601 et seq. (2006), which restricts eligibility of legal immigrants for federally funded public benefits. Because of PRWORA, the Commonwealth has never received Federal reimbursement for the Commonwealth Care Health Insurance benefits that previously had been expended on behalf of the class of legal aliens at issue here. As the record in this case reflects, this means that, instead of receiving reimbursement of at least fifty per cent for otherwise federally eligible expenditures, the Commonwealth bore responsibility for one hundred per cent of the cost of benefits for the legal alien class. It is understandable that, in a time of economic hardship, the Commonwealth would seek to reduce funding for its social welfare programs. It permissibly may do so if all those entitled to benefits receive the same, though reduced, benefit. However, it may not single out a discrete and insular minority for disparate treatment so that more benefits will be available to the majority group. See *Mathews* v. *Diaz,* 426 U.S. 67, 86 (1976); *Graham* v. *Richardson, supra* at 374.

---

494 F. Supp. 215, 216-218 (W.D. La. 1980) (person of Acadian descent protected under "national origin" term despite historical absence of independent nation of Acadia). See also Perea, *supra* at 852-853 (discussing use of "national origin" as basis for protection of ethnic traits and noting, " 'National origin' is usually the wrong characteristic to protect. Most discrimination occurs because of ethnic traits, many of which are perceptible, and not because of mere national origin, which is usually not immediately perceptible"). Cf. *Hernandez* v. *Texas,* 347 U.S. 475, 480 n.12 (1954) (Mexican-Americans identified as distinct class based on surnames); *Shaare Tefila Congregation* v. *Cobb,* 481 U.S. 615, 617 (1987), quoting *Saint Francis College* v. *Al-Khazraji, supra* at 613 (Jews no longer considered separate race; but protected under § 1982, which was intended to protect against "discrimination solely [based on] their ancestry or ethnic characteristics").