JACK E. ROBINSON, THIRD vs. STATE BALLOT LAW
COMMISSION & others.[1]

MARK G. WHITE vs. STATE BALLOT LAW COMMISSION
& another.[2]

Suffolk. July 14, 2000. - July 18, 2000.

Present: ABRAMS, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Secretary of the Commonwealth. Elections,* Ballot, Primary, Validity of
nomination papers. *Laches. Limitations, Statute of. Administrative Law,*
Exhaustion of remedies.

A citizen who filed nomination papers for the office of United States Senator
with the Secretary of the Commonwealth, whereupon the Secretary
disqualified certain signatures, properly pursued a remedy before the State
Ballot Law Commission prior to timely filing petitions in this court pursu-
ant to G. L. c. 56, § 59, and G. L. c. 30A, § 14, seeking relief from the
Secretary's decision as well as the commission's further decision to
invalidate other signatures [147-148], and, in any event, objectors to the
validity of the signatures suffered no prejudice from any delay occasioned
thereby [148-149].

Duplicate nomination papers on which the back of the form was reproduced
upside down but which in all other respects were exactly the same as the
official form did not violate the exact copy rule set forth in G. L. c. 53,
§ 47, and such nomination papers with signatures should have been al-
lowed by the Secretary of the Commonwealth. [149-152]

CIVIL ACTIONS commenced in the Supreme Judicial Court for
the county of Suffolk on July 5, 2000.

The cases were reported by *Judith A. Cowin*, J.

*Jack E. Robinson, III*, pro se.

*William A. McDermott, Jr.*, for Mark G. White.

*John R. Hitt*, Assistant Attorney General (*Peter Sacks*, As-
sistant Attorney General, with him) for State Ballot Law Com-
mission & another.

*Steven S. Epstein*, for Steven P. Olson & another, amici curiae,
submitted a brief.

[1]Secretary of the Commonwealth, Mark G. White, Steven P. Olson, and
Paul G. Huberdeau.

[2]Secretary of the Commonwealth.

COWIN, J. These cases, which are presented on a statement of agreed facts, involve a decision of the State Ballot Law Commission (commission) preventing Jack E. Robinson, III, from appearing on the State primary ballot for the Republican nomination for the office of United States Senator. In order to be placed on the State primary ballot for the office of United States Senator a candidate must obtain the signatures of at least 10,000 qualified voters. G. L. c. 53, § 6. On June 6, 2000, Robinson filed his nomination papers with the Secretary of the Commonwealth (Secretary) containing a total of 10,342 signatures. The Secretary, after reviewing the nomination papers, disallowed nomination papers containing 129 signatures because the backs of these nomination papers were photocopied upside down. The Secretary concluded that only nomination papers produced by his office or exact copies of those papers could be forwarded to the commission for review and that an upside down copy is not an exact copy. The Secretary also disallowed seventy-five additional signatures for reasons which are not in dispute here. After completing his review, the Secretary forwarded 10,139 signatures[3] to the commission as being filed in the proper form.

On June 9, 2000, two objections to the validity of signatures on Robinson's nomination papers were filed with the commission, one by Mark G. White, and the other by Steven P. Olson and Paul G. Huberdeau. White's objection filed with the commission contained his signature and the signature of his counsel. White served a copy of the objection on Robinson, as required by G. L. c. 55B, § 5; however, it did not contain the signature of White or his counsel.

During the proceeding before the commission to consider the objections, Robinson stipulated to the invalidation of twenty-nine of the challenged signatures. On June 30, 2000, the commission sustained the objections to an additional 124 signatures, thereby disqualifying them and reducing Robinson's total to 9,986, fourteen signatures short of the number needed to appear on the State primary ballot. It also determined that it did not

---

[3]We recognize that the numbers stated above do not total 10,139 (i.e., 10,342 - 129 - 75 = 10,138). However, the parties, in their statement of agreed facts, stipulated that Robinson filed 10,139 certified signatures. In addition, the receipt that the Secretary issued to Robinson indicated that 10,139 certified signatures were filed. We accept the parties' stipulation that 10,139 certified signatures were filed by Robinson and forwarded to the commission as being filed in proper form.

have jurisdiction to consider the nomination papers that the Secretary had ruled were not exact copies. The commission, therefore, ordered the Secretary not to print Robinson's name on the ballot.

Robinson filed a petition with a single justice of this court pursuant to G. L. c. 56, § 59, and G. L. c. 30A, § 14, seeking relief from (1) the Secretary's decision to invalidate the 129 signatures because, he contends, the Secretary erred in concluding that the nomination papers were not the exact copies of original nomination papers; and (2) the commission's decision to invalidate 124 signatures because, he argues, he did not receive an exact copy of the objection filed with the commission by White as required by G. L. c. 55B, § 5. The single justice reported these questions to the full court. We conclude that the papers submitted by Robinson to the Secretary were exact copies. Consequently, Robinson's name must be placed on the State primary ballot as he has collected over 10,000 qualified signatures. As a result, we need not reach Robinson's claim that White's objection filed before the commission was improper. We also need not reach White's cross claim that the commission committed an error of law by not adopting a "contamination theory" as a basis for striking an additional thirty-eight signatures. White's cross claim is moot because, even if his position were correct and the thirty-eight signatures were struck, Robinson would still have enough qualified signatures for his name to be printed on the ballot.[4]

1. *Timeliness of Robinson's claim.* Before addressing the Secretary's decision to disallow Robinson's nomination papers for failing to submit an exact copy of the papers, we dispose of a preliminary argument raised by White. He claims that the doctrine of laches and the statute of limitations bar Robinson's challenge to the Secretary's decision. White contends that Robinson had an obligation to challenge the Secretary's decision in court prior to his petition before the single justice filed on July 5. He argues that Robinson had an available form of relief

[4]Further, we do not consider Robinson's argument contesting the Secretary's decision to disallow twenty-four other signatures. This claim is untimely as it was not raised before the single justice and therefore not reported. Moreover, the claim is moot given our disposition of this case. We also decline to address arguments raised by Olson and Huberdeau who have filed an amicus brief in this case. An amicus may not argue issues not raised by the parties. See *Pineo* v. *Executive Council,* 412 Mass. 31, 35 n.6 (1992), citing *Wellfleet* v. *Glaze,* 403 Mass. 79, 80 n.2 (1988).

pursuant to G. L. c. 56, § 59, in the Superior Court or this court that he could have asserted immediately after the Secretary's decision. He argues that, by waiting to file a court action until after the commission's decision that it lacked jurisdiction to consider the Secretary's ruling, Robinson lost his right to bring this claim before this court. We disagree.

Robinson followed the correct course of action by pursuing a remedy before the commission prior to filing a complaint in court. General Laws c. 56, § 59, provides that "[t]he supreme judicial court and the superior court department of the trial court shall have jurisdiction of civil actions to enforce the provisions of chapters fifty to fifty-six . . . ." However, it is a well-settled principle that, "[i]n the absence of a statutory directive to the contrary, the administrative remedies should be exhausted before resort to the courts." *Gordon* v. *Hardware Mut. Cas. Co.*, 361 Mass. 582, 587 (1972), and cases cited. This policy reflects "a sound principle of law and jurisprudence aimed at preserving the integrity of both the administrative and judicial process." *Assuncao's Case*, 372 Mass. 6, 8 (1977). Robinson believed that he had a proper administrative forum before the commission to challenge the Secretary's decision and was not notified that such a remedy was foreclosed until the commission's decision was issued on June 30. Contrary to White's suggestion in his brief, we do not believe that the commission's conclusion that it did not have jurisdiction to consider Robinson's claim was so obvious that he should have proceeded directly to court pursuant to G. L. c. 56, § 59.[5] On learning that any administrative remedies were foreclosed, Robinson timely prepared and filed a petition before a single justice of this court. Robinson did not unnecessarily delay these proceedings so that his claim should not be heard.

Moreover, even if Robinson's actions did delay these proceedings, as White recognizes in his brief to this court, "[l]aches is not mere delay but delay that works disadvantage to another." *Moseley* v. *Briggs Realty Co.*, 320 Mass. 278, 283 (1946), quoting *Calkins* v. *Wire Hardware Co.*, 267 Mass. 52, 69 (1929). White has not suffered any such disadvantage. White's claim might be valid if the issues he raises were fact specific and required presentation of evidence. However, the issues before

---

[5]Because of our resolution of this case we have no occasion to consider the validity of the commission's conclusion that it did not have jurisdiction to consider the nomination papers not forwarded by the Secretary.

this court are legal in nature and are the same issues that White has already argued before the commission. All that White was required to do to prepare for this proceeding was to brief and argue before the court essentially the same issues that he presented to the commission. To the extent that White has suffered any disadvantage by Robinson's actions, it is not enough to outweigh the importance of ballot access, implicating as it does fundamental concerns under the First Amendment to the United States Constitution, and the public's right to choose candidates for elective office. See, e.g., *Anderson* v. *Celebrezze*, 460 U.S. 780, 806 (1983).

2. *Exact copy rule.* We now turn to the merits of Robinson's claim against the Secretary. See *Capezzuto* v. *State Ballot Law Comm'n*, 407 Mass. 949, 952 (1990). See also *McCarthy* v. *Secretary of the Commonwealth*, 371 Mass. 667, 676-677 (1977). He claims that the Secretary misapplied the exact copy rule by disallowing duplicate nomination papers on which the back of the form was photocopied upside down. General Laws c. 53, § 47, states in part:

> "In no case shall any blank forms for such nominations be larger than eight and one half inches by fourteen inches, nor shall anyone be prohibited from making exact copies of such forms provided by the secretary of state for the purpose of collecting signatures for such nominations, nor shall any such copies be rejected for certification or submittal to the secretary of state."

We have never before considered this particular statutory provision. However, we have considered this same language in G. L. c. 53, § 22A, the provision regarding signatures for initiative and referendum petitions. In *Hurst* v. *State Ballot Law Comm'n*, 427 Mass. 825, 830 (1998), we held that, pursuant to G. L. c. 53, § 22A, and art. 48, The Referendum, III, § 4, of the Massachusetts Constitution, as amended by art. 74, § 3, and art. 81, § 5, of the Amendments,[6] an "exact copy" of a referendum petition meant that the petition had "no alterations

---

[6]Article 48, The Referendum, III, § 4, of the Massachusetts Constitution, as amended by art. 74, § 3, and art. 81, § 5, of the Amendments, provides: "A referendum petition may ask for the repeal of an emergency law . . . . Such petition shall first be signed by ten qualified voters of the commonwealth, and shall then be filed with the secretary of the commonwealth . . . . The secretary of the commonwealth shall provide blanks for the use of subsequent signers,

— additions or deletions — of any sort." One year later in *Walsh* v. *Secretary of the Commonwealth*, 430 Mass. 103, 103-104 (1999), we considered a challenge asking that we change the "bright-line rule announced in *Hurst* v. *State Ballot Law Comm'n.*" We declined, concluding that any alteration of a referendum petition would violate the exact copy rule announced in the *Hurst* case no matter whether the alteration "was placed during copying or during circulation." *Id.* at 108.

Robinson argues that the exact copy rule announced in the *Hurst* case has no application here because this case concerns a nomination paper for a Federal office and not a referendum petition. He points out, inter alia, that the exact copy rule for referendum petitions is derived both from a statute, G. L. c. 53, § 22A, and from the Massachusetts Constitution, art. 48, while the exact copy language for nomination papers comes exclusively from a statute, G. L. c. 53, § 47. Based on this and other differences, he suggests that we need not apply the rigorous exact copy standard explicated in the *Hurst* case. We recognize that there are significant differences between referendum petitions and nomination papers so that a less rigorous exact copy standard for nomination papers may be appropriate. However, we need not in this case identify the contours of the exact copy standard under G. L. c. 53, § 47, for nomination papers, because even under the stringent exact copy standard that we have applied to referendum petitions, we conclude that Robinson has adequately complied with the copy requirement in § 47.

In the *Hurst* case, we set forth the purpose of the exact copy rule as preventing the use of the referendum petition as a vehicle for "political sloganeering" and preventing potential signatories from being "misled" by those campaigning for the referendum. *Hurst* v. *State Ballot Law Comm'n, supra* at 828. We concluded that any "added information" on the referendum petition could adversely affect public perceptions and might materially misinform signers of the petition, and would therefore violate the exact copy rule by producing a petition of questionable validity. *Id.* at 830. These same concerns, to some degree, may apply as well to manipulation of a candidate's nomination papers. These papers are official documents that should not be used as part of the "political sloganeering" of the candidate's

and shall print at the top of each blank a fair, concise summary of the proposed law as such summary will appear on the ballot together with the names and residences of the first ten signers."

campaign literature; if the nomination papers appear to be primarily partisan documents a signer may become confused as to the purpose and import of signing the form.

With these concerns in mind, we examine the forms submitted by Robinson and compare them to the forms that we invalidated in the *Hurst* and *Walsh* cases. In the *Hurst* case, the referendum petitions contained preprinted boxes, stamps, and highlights that had the name and return address of the organization advocating the petition. *Hurst* v. *State Ballot Law Comm'n, supra* at 826-827. We held that these alterations added improper information to the official information provided by the Secretary and thus "invade[d] the small but vital area of neutrality that the Constitution and G. L. c. 53, § 22A, demand." *Id.* at 830.

In the *Walsh* case, the petitions at issue contained numerous nonconforming features so that the petition presented to the voter for signature contained either more or less information than the official petition published by the Secretary. *Walsh* v. *Secretary of the Commonwealth, supra* at 104-105. In both cases, the fundamental concern of signer misperception was implicated because different signers were exposed to different amounts of information and voters could not distinguish between official information and advocacy information inserted gratuitously by the supporters of the petition.

The nomination papers submitted by Robinson do not raise the same concerns. All photocopied nomination papers presented to every signer were exactly the same as the official form; they contained every word in the Secretary's form and had no additional markings of any kind. Thus, persons who signed Robinson's nomination papers were presented with official information only and were not subjected to any other advocacy material that may have confused them as to the purpose of the nomination papers. Thus, none of the infirmities in *Hurst* and *Walsh* is present.

We reject the Secretary's contention that the signers of the papers might have been misled in some significant way because the printed information appeared upside down at the bottom of the back of the papers. The likelihood of such an occurrence is so slim as to be virtually nonexistent. A person signing the paper would invert it before signing it, and thus would be presented with, and have the opportunity to read, the informa-

tion required by law to be on the back of the paper.[7] Moreover, the Secretary's position does not further the purpose of the statute. The statute is designed to prevent misleading those who sign the paper. There is no public purpose served by construing this statute to prevent access to the ballot because of this type of photocopying problem. We construe the statute "in the light of the legislative objectives which were served by its enactment so as to effectuate the purpose of the framers." *John T. Callahan & Sons* v. *Malden*, 430 Mass. 124, 128 (1999), quoting *Interstate Eng'g Corp.* v. *Fitchburg*, 367 Mass. 751, 757 (1975). We conclude that photocopying the back of the nomination papers upside down does not violate the exact copy language set forth in G. L. c. 53, § 47. The nomination papers containing 129 signatures should have been allowed by the Secretary.[8]

3. *Conclusion.* Robinson's petition for relief is allowed. The Secretary's decision is set aside. He is instructed to validate the challenged nomination papers and to have Robinson's name printed on the State primary ballot as a candidate for the Republican nomination for the office of United States Senator. We remand Robinson's challenge to the commission's decision and White's cross claim to the county court with instructions that these claims be dismissed as moot.

*So ordered.*

---

[7]We are not persuaded by the Secretary's suggestion that it would create difficulty for his office to review the signatures.

[8]At oral argument of the appeals, White's counsel waived any further challenge to the validity of these 129 signatures.