NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12979

HELEN BRADY  vs.  STATE BALLOT LAW COMMISSION & others.[1]


Suffolk.     July 10, 2020. - August 3, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Cypher,
& Kafker, JJ.


Election, Ballot, Validity of nomination papers.  Secretary of
    the Commonwealth.  Constitutional Law, Elections.



    Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on May 5, 2020.

    The case was reported by Kafker, J.


    Christopher A. Kenney for the petitioner.
    Elizabeth Kaplan, Assistant Attorney General, for the
respondents.
    Gerald A. McDonough for the interveners.


    KAFKER, J.  This appeal concerns a decision of the State

Ballot Law Commission (SBLC) preventing Helen Brady from

appearing on the September 1, 2020, State primary election

_____

    [1] Secretary of the Commonwealth; and Massachusetts
Democratic Party and Leon Arthur Brathwaite, II, interveners.

ballot for the Republican nomination for the office of United States representative for the Ninth Congressional District in Massachusetts. The SBLC, acting upon the objection of Leon Arthur Braithwaite, II, a registered voter in the Ninth Congressional District and the vice-chair of the Massachusetts Democratic State Committee, struck all of the certified signatures that Brady had secured from voters in an effort to appear on the ballot.

Following this court's allowance of the electronic collection of signatures on nomination papers in Goldstein v. Secretary of the Commonwealth, 484 Mass. 516, 531-532 (2020), Brady, with the aid of a software application provided by a third-party vendor, had gathered all of her voter signatures electronically. There is no question that she had collected the required minimum number of signatures. Nor is there a question that the signatures were legitimate. Nonetheless, according to the SBLC, the process Brady utilized failed to comply with formal electronic signature requirements outlined by the court in the Goldstein decision (Goldstein process), as well as with an "advisory" issued by the Secretary of the Commonwealth (Secretary) in response to the Goldstein decision. In brief, the SBLC ruled that Brady departed from the Goldstein process by failing to submit the "native" electronic document signed by the voter to local election officials for certification. Instead,

she submitted a document that differed from the native electronic document, albeit in form only, not substance. Also, the SBLC concluded that Brady failed to abide by the Secretary's advisory when she had voters sign her nomination papers electronically by applying a computer mouse, stylus, or finger to a separate box provided for that purpose, rather than directly on the signature line itself.

Brady challenged the SBLC's ruling in the Superior Court, but then moved to consolidate that action with an existing petition that she, along with three other candidates seeking to appear on the State primary ballot, had filed in the county court. Given the time sensitive nature of the appeal, with the Secretary needing to finalize the State primary ballot by July 14, 2020, to meet a federally mandated deadline,[2] the single justice consolidated the matters and reserved and reported them to the full court.[3] On July 13, 2020, following expedited

---

[2] By Federal law, ballots must be transmitted to military and overseas voters no later than forty-five days in advance of the election. See 52 U.S.C. § 20302(a)(8)(A).

[3] Notwithstanding the consolidation of the two matters, the only issue before the court concerns Brady's appeal from the SBLC's decision. The three other candidates to the underlying petition -- Caroline Colarusso, Julie Hall, and Rayla Campbell -- are not parties to this appeal. The petition was dismissed as moot by the single justice as to Colarusso and Hall after they qualified for and were placed on the primary ballot. Campbell pursued a separate appeal before the full court, which is pending.

briefing and oral argument, we vacated the SBLC decision and ordered the Secretary to place Brady's name on the ballot, concluding that the electronic filing process utilized by Brady complied with the substance of the material requirements of the Goldstein decision.  We now issue this opinion to explain fully the court's reasoning.

Background.  1.  The Goldstein decision.  On April 17, 2020, the court issued the decision in Goldstein, granting several forms of equitable relief to candidates seeking to collect voter signatures on nomination papers as required to appear on the State primary election ballot.  In recognition of the extraordinary restrictions on in-person contact during the COVID-19 pandemic, the court (1) reduced the number of required certified signatures by fifty percent (50%), (2) extended the deadlines for certain candidates to submit signed nomination papers to local election officials for certification and then file certified signatures with the Secretary, and (3) ordered the Secretary to allow for the submission of nomination papers with electronic signatures, not just wet-ink original signatures ("wet" signatures).  Goldstein, 484 Mass. at 529-532.

Regarding the last item, the court adopted and outlined an electronic signature collection process that had been recommended as a compromise solution by the Secretary and viewed with favor by the candidates in that case:

> "[C]andidates seeking to be on the ballot for the September 1 primary election [are] allowed to scan and post or otherwise distribute their nomination papers online. Voters may then download the image of the nomination papers and either apply an electronic signature with a computer mouse or stylus, or print out a hard copy and sign it by hand. <u>The signed nomination paper can then be returned to the candidate, or a person working on the candidate's behalf, either in electronic form (by transmitting the 'native' electronic document or a scanned paper document) or in paper form (by hand or mail)</u>. The candidates will still have to submit the nomination papers to local election officials in hard copy paper format, but the proposed process will alleviate the need for, and the risk associated with, obtaining 'wet' signatures. The Secretary is ordered forthwith to provide clear guidance to prospective candidates as to how this electronic signature collection process may be accomplished effectively, although candidates need not await that guidance to get started." (Emphasis added.)

<u>Goldstein</u>, 484 Mass. at 531-532.

Four days later, on April 21, 2020, the Secretary issued an "advisory" concerning the collection of signatures in light of the <u>Goldstein</u> decision, which provided, in relevant part:

> "The voter can sign by either a) using a computer mouse or stylus <u>applied to the signature line of the nomination paper screen image</u> to sign their actual original signature in person and in real time or b) printing out the transmitted nomination paper and affixing their original signature by hand ('wet signature')" (emphasis added).

2. <u>Brady's nomination papers</u>. Following the issuance of <u>Goldstein</u>, Brady retained the services of a third-party vendor, VenueX Media, LLC (VenueX), to assist her in collecting electronic signatures from registered voters in the Ninth Congressional District. Having anticipated the potential benefit to collecting signatures electronically during the

COVID-19 pandemic, VenueX had been working to develop a software application for that purpose.  Once the court allowed for that possibility, VenueX finalized the application, with some modifications to comply with the Goldstein process, and made it available to candidates.  All told, forty candidates in Massachusetts utilized VenueX's application, including Democrats, Republicans, and Independents.[4]  Brady, for her part, used it to collect all of her signatures; she did not collect any wet signatures.

The application worked as follows.  VenueX created a unique webpage for Brady ("www.nominationpapers.com/helenbrady"), which consisted of an image of the back and front of her nomination papers.  Brady solicited voters to visit the webpage by sending them a link via Facebook, Twitter, e-mail, or other means. Voters could access the webpage by "clicking" on that link using any device connected to the Internet, such as a cell phone, tablet, desktop computer, or laptop.  Once on the webpage, voters could see an image of Brady's nomination papers, containing her name and address, as well as the elected office

---

[4] While it is undisputed that forty candidates utilized VenueX's application, it is not evident from the record how many of them actually submitted signatures for certification that were collected using the application or, if they did, how many such signatures they submitted.  At least three candidates who used the application qualified to appear on the ballot.  No objections were filed to their nomination papers with the SBLC.

she was seeking, her party affiliation, and the date of the State primary election. There was also a green-colored block over the first voter signature line on the image of the nomination papers, which read "SIGN HERE." When voters clicked on that block, they were directed to a box elsewhere on the webpage, where they could use a stylus, mouse, or finger to sign their name. There were also boxes on the webpage where voters typed in their name, e-mail address, telephone number, street address, city or town, State, and ZIP code. Upon signing and entering the other data, voters would then click on another green-colored block on the webpage, which read "Submit," and the process would be complete. Voters could then download a copy of the nomination papers they submitted, which came in the form of a Portable Document Format, or .pdf[5] (first nomination papers). On the face of the first nomination papers, the voter's signature was visible on the line where the green "SIGN HERE" block had previously appeared, along with the date and time of the submission and the voter's address. A .pdf copy of the

---

[5] As described by the company that purports to have invented the Portable Document Format, or .pdf, it "is now an open standard, maintained by the International Organization for Standardization (ISO). PDF documents can contain links and buttons, form fields, audio, video, and business logic. They can be signed electronically, and you can easily view PDF files on Windows or Mac OS using the free Acrobat Reader DC software." See Adobe Acrobat, What is PDF?, https://acrobat.adobe.com/us/en/acrobat/about-adobe-pdf.html [https://perma.cc/QX28-6Y2X].

first nomination papers was also automatically sent by e-mail message to the voter, as a form of "receipt."[6]

When voters clicked "Submit," however, the first nomination papers were not, in fact, submitted to Brady or her campaign. Instead, the data entered on the webpage by each voter was transmitted to a database maintained by VenueX. The captured data included the submission date and time; the voter's name, e-mail address, telephone number, street address, city or town, State, and ZIP code; a link to an image of the voter's signature, which was stored in the "cloud"[7]; the unique Internet protocol (IP) address of the device the voter used to submit the nomination paper; and a unique identification number for each submission. Brady and her campaign had access to the database for purposes of tracking the submissions as they were collected, but they could not alter or download the content. Nor could

---

[6] Voters could have downloaded the first nomination papers from the webpage, printed them out, signed them with a wet signature, and returned them to Brady's campaign. Presumably, they also could have printed out the .pdf of the first nomination papers bearing their electronic signature, and returned it to Brady's campaign. However, no voters submitted nomination papers to Brady's campaign in either of those ways. Nor does it appear that there was any direction provided on the webpage that would have prompted voters to do so.

[7] The "cloud" refers to cloud computing, a type of remote electronic data storage. See Commonwealth v. Gelfgatt, 468 Mass. 512, 536 (2014) (Lenk, J., dissenting).

they access the stored images of the voter signatures. Only VenueX had that level of access.

The final step in the process occurred when VenueX provided Brady's campaign with a second version of the signed nomination papers, which were created by importing the data from the database, including the stored image of the voter's signature (second nomination papers). The second nomination papers, which were also in .pdf form, would then be electronically transferred to Brady's campaign in a folder, whereupon they could be printed out en masse and submitted to location election officials for certification. The second nomination papers were not identical to the first nomination papers. As with the first nomination papers, the second contained Brady's name and address, her Republican party affiliation, and the elected office she was seeking, but this information now appeared in a different font in all upper case letters, whereas it appeared in upper and lower case letters in the first. The second nomination papers, like the first, also included the voter's signature on the line where the green "SIGN HERE" block had previously appeared, but, unlike the first, did not include the date and time of submission. The typewritten name of the voter also was inserted on the second nomination papers on the line next to the voter's signature, which was not the case on the first. Otherwise, the

first nomination papers and second nomination papers were the same.[8]

As a result of the Goldstein decision, Brady needed at least 1,000 certified voter signatures to appear on the Republican State primary ballot -- fifty percent (50%) of the amount required by statute. See G. L. c. 53, § 44. Ultimately, local election officials in towns and cities in the Ninth Congressional District certified 1,066 of her signatures, which Brady then filed with the Secretary by the applicable June 2, 2020, deadline.

3. Objection before the SBLC. By law, registered voters from the district in which a candidate is seeking nomination have three days from the filing deadline with the Secretary to file objections to nomination papers with the SBLC. See G. L. c. 55B, § 5. On June 5, 2020, Braithwaite filed an objection, claiming that Brady failed to comply with the Goldstein process because the voters who signed her nomination papers did not return, and she did not submit, the "native" electronic document. In addition, he claimed that Brady failed to comply with the Secretary's advisory because the voters had not signed by applying a computer mouse or stylus to the signature line on

---

[8] The placement and size of the voter's signature was also slightly different on the second nomination papers, but the signature nonetheless appeared on the signature line in both versions of the nomination papers.

the image of Brady's nomination papers. Braithwaite maintained that, on either ground, all 1,066 of Brady's certified signatures had to be declared invalid.[9]

On June 16, 2020, the SBLC held a hearing on Braithwaite's objections, at which only one witness, the founder of VenueX, testified. Subsequently, on June 26, 2020, the SBLC issued a decision and written statement of reasons, striking all 1,066 of Brady's signatures on the grounds advanced by Braithwaite. In addition, the SBLC ruled that the process utilized by Brady violated public policy by storing images of voter signatures without their consent and without adequate measures to protect against the fraudulent application of those signatures to other documents (i.e., documents other than the nomination papers). At the same time, the SBLC acknowledged that there was no evidence that any voter's signature was applied to any document other than Brady's nomination papers, and credited the testimony of VenueX's founder that no such misapplication had occurred. The SBLC also credited the testimony of VenueX's founder, and acknowledged that there was no evidence to contradict, that all 1,066 voters had, in fact, signed, or at least made some mark, with a computer mouse, stylus, or finger in the signature box on

---

[9] Braithwaite also raised various other objections to approximately 117 of Brady's certified signatures. The SBLC, however, chose not to adjudicate those objections, and Braithwaite has waived them on appeal.

Brady's webpage before clicking "Submit." But see note 8, supra.

Discussion. 1. Compliance with the Goldstein process. The relevant facts concerning the electronic signature gathering process utilized by Brady are not in dispute. The only question, therefore, is one of law: whether the electronic signature process Brady utilized complied with the requirements set out in Goldstein. In making such determination, we owe no deference to the SBLC. The court defined the emergency electronic signature procedures for the September primary election itself. We are therefore interpreting our own decision, not the general election laws within the special expertise of the SBLC. Compare Swift v. AutoZone, Inc., 441 Mass. 443, 450 (2004) ("In general, we grant substantial deference to an interpretation of a statute by the administrative agency charged with its administration" [citation omitted]). Our review of the question is thus de novo. See Capezzuto v. State Ballot Law Comm'n, 407 Mass. 949, 952 (1990) ("conclusions of law to be drawn from [the] facts are subject to independent judicial review").

As we undertake our review, we remain mindful of several important principles. First and foremost, the constitutional rights to run for office and to vote for a candidate who has satisfied the requirements to stand for office are fundamental.

See Goldstein, 484 Mass. at 524 (for "240 years since the adoption of our Declaration of Rights in 1780, art. 9 [of the Massachusetts Declaration of Rights] has served to protect the 'fundamental' and 'intertwine[d]' rights of candidates to gain access to the ballot and of voters to cast their ballots as they see fit" [citation omitted]).  They are essential to the proper functioning of our democracy.  As we recognized in Goldstein, the pandemic posed a unique threat to the exercise of these fundamental rights and required us to apply strict scrutiny to the existing statutory signature gathering requirements.  See id. at 524-525.  In the end, we declared the existing signature requirements unconstitutional during the pandemic and granted extraordinary equitable relief to preserve and protect art. 9 rights, cutting in half the minimum number of signatures required and allowing some form of electronic signature gathering.  See id. at 526 (existing "signature requirements . . . in this time of pandemic are unconstitutional as applied to the plaintiffs, and other similarly situated candidates").  In so doing, we recognized that some technological adaptation was required to address the emergency, and a certain amount of flexibility was required to avoid constitutional difficulties.  See id. (existing "signature requirements, which may only impose a modest burden on candidates in ordinary times, now impose a severe burden on, or significant interference with, a

candidate's right to gain access to the September 1 primary ballot").  See also id. at 533 (Kafker, J., concurring) ("it is the in-person aspect of the [existing] signature requirement that renders it unduly burdensome in light of the current pandemic and quarantine, as this requirement presents public safety risks for both the campaign and individual signatories" [emphasis in original]).

A second principle underlying our Goldstein decision was the temporally limited, emergency nature of its relief. Recognizing the unpredictable force and duration of the emergency, the equitable relief granted in Goldstein, including the particular electronic signature gathering process it authorized, only applied during a finite period of time and to a finite group of candidates.  See id. at 518 ("We emphasize that the declaration we make and the equitable relief we provide is limited to the [September 1, 2020] primary election in these extraordinary circumstances . . .").  It was emergency relief tailored to the emergency itself.

It was also the product of a necessarily expedited proceeding.  The petition was filed on April 8, 2020, and decided nine days later, without the benefit of any lower court proceedings.  While the court asked the parties to address the logistics of, and potential problems with, collecting and verifying electronic signatures, with an eye toward adopting a

more comprehensive process, it quickly became clear that it would not be possible to do so in such short order.  Id. at 531 ("submissions have convinced us that there are too many issues and unanswered questions to allow us confidently to impose a remedy that would transform a nomination system that required 'wet' signatures into one that permitted a broad range of electronic signatures").  Instead, the court adopted a "modest means" of electronic signature gathering put forward as a last-minute compromise by the Secretary, id., despite the "awkward, multistep process" it involved, id. at 535 (Kafker, J., concurring).  In an effort to avoid the type of dispute we are now forced to resolve here, we also asked and expected the Secretary to provide further follow-up guidance to candidates regarding the implementation of the electronic signature gathering process that his office had proposed.  The guidance that was provided, however, was quite limited, indeed unnecessarily so.

Finally, as discussed at length in the concurrence in Goldstein, see id. at 532-538, we remain convinced that the legislative and executive branches, not the courts, are best suited for enacting a comprehensive electronic signature collection process, a process that was long overdue even before the pandemic.  With all that said, we now turn to the challenge to Brady's signature gathering process.

We start by noting what is not being challenged. At the heart of our Goldstein decision were certain essential requirements. First, we cut in half the number of certified signatures that a candidate was required to gather, with that number being reduced to 1,000 for those seeking Congressional office, like Brady. It is undisputed here that over 1,000 registered voters in the Ninth Congressional District signed, or at least made some mark, in the signature box on Brady's webpage and then clicked on the box that read "Submit," thereby conveying support for Brady's appearance on the September primary ballot.

We also sought in Goldstein to ensure that the signature gathering process produced legitimate signatures. There is no dispute that all of the signatures gathered by Brady are legitimate.[10] There is no evidence or suggestion of fraud or impropriety. Moreover, not one of the 1,066 registered voters who purportedly signed Brady's nomination papers came forward and denied having done so. Nor was there even a suggestion that any voter had made such a claim. In short, there is no dispute that Brady satisfied the essential substantive requirements of the Goldstein decision.

---

[10] As previously noted, see note 9, supra, Braithwaite had asserted objections to certain specific signatures gathered by Brady, but the SBLC did not adjudicate those objections, and Braithwaite has waived them on appeal.

Instead, the dispute concerns specific issues of form, particularly the language in Goldstein providing that the "signed nomination paper [could] be returned [by the voter] to the candidate, or a person working on the candidate's behalf, . . . in electronic form (by transmitting the 'native' electronic document or a scanned paper document)" (emphasis added). Goldstein, 484 Mass. at 531. According to the court's ruling, the candidate, or someone acting on the candidate's behalf, was then authorized to print the native electronic document out and submit it in "hard copy paper format" to local election officials for certification. Id.

According to Braithwaite and the SBLC, the native electronic documents in the process utilized by Brady were the first nomination papers:  the .pdf the voter could download, and also received as an attachment to an e-mail message, after electronically signing and submitting the nomination papers. As Braithwaite and the SBLC point out, however, voters did not return the first nomination papers to Brady. Nor did Brady, or anyone acting on her behalf, print them out and submit them to local election officials in hard copy paper format. Instead, Brady utilized VenueX's application to collect the data and signature entered by the voter in the process of creating the first nomination papers, imported them to another version of the nomination papers (what we have referred to as the second

nomination papers), and then printed that version out in hard copy paper format and submitted it to local election officials. This, according to Braithwaite and the SBLC, violates the Goldstein process and necessitates striking all of Brady's certified signatures.

We begin our analysis with the language of the Goldstein process itself. The phrase "'native' electronic document" was regrettably not defined in the decision or in the Secretary's advisory.[11] Yet, as utilized in Goldstein, it seems reasonably clear that the court was referring to the original electronic document signed and electronically transmitted by the voter. In the process utilized by Brady, that would seem to refer to the first nomination papers, as Braithwaite and the SBLC suggest. No doubt, had the version of the nomination papers downloaded by the voter after clicking "Submit," or the version that was automatically sent to the voter as a form of receipt, been sent to the candidate or someone acting on her behalf, and then submitted to the local election officials, this requirement of

---

[11] The phrase "native file format" is common and refers to "a method used by the computer operating system or file management to arrange data. For example, when you save a Microsoft Word document, the data in the file is customized and optimized to be read in Microsoft Word. These files have the .doc or .docx file extension." See Computer Hope, Native file format, https://www.computerhope.com/jargon/n/natifile.htm [https://perma.cc/94WK-DDEJ].

Goldstein would have been satisfied in form as well as substance.

According to Braithwaite and the SBLC, the only way a voter could legally return the nomination papers electronically under Goldstein would be to transmit the native electronic document or a scanned paper document.  Although we disagree with this contention, we recognize that our decision could have been clearer.  Our reference to the "one modest means" of electronic signature gathering proposed by the Secretary was not intended to be exclusive.  The decision does not state that the voter "must" or "shall only" return the nominations papers electronically by transmitting either the native electronic document or a scanned paper document.  The use of the word "can" was intentional, and the words "'native' electronic document" and "scanned paper document" were intended as obvious permissible examples of the ways in which the nomination papers could be transmitted electronically by voters.  Again, however, we recognize that this point could have been made more clearly by prefacing the parenthetical with the express words, "for example," or even the Latin abbreviation, "e.g."  Of course, the court's recognition of some limited variation on what was permissible does not mean that the nomination papers can be transmitted any which way, or that the particular process Brady used was proper.  For further guidance on resolving this

question, we are again informed by the fundamental principles of election law.

"Election laws are framed to afford opportunity for the orderly expression by duly qualified voters of their preferences among candidates for office, not to frustrate such expression." Swift v. Registrars of Voters of Quincy, 281 Mass. 271, 277 (1932). See McCarthy v. Secretary of the Commonwealth, 371 Mass. 667, 683 (1977) ("The principal objective of election laws is to ensure that the public will may be expressed through the electoral process"). As we have previously explained, access to the ballot is a fundamental right, essential to the success of our democracy. In cases like the present one, where someone seeks to enforce restrictions on that fundamental right, courts have been careful to distinguish between violations of form and violations of substance. See, e.g., Robinson v. State Ballot Law Comm'n, 432 Mass. 145, 149-152 (2000) (no public purpose served by construing statute to prevent access to ballot merely because back of candidate's nomination paper was photocopied upside down); Garrison v. Merced, 33 Mass. App. Ct. 116, 117 (1992) ("exceedingly technical arguments should not block access to the ballot"). The alleged violation here falls decidedly into the former category.

To be clear, the process utilized by Brady was not ideal, and it would have been preferable had she simply collected and

submitted the first nomination papers. At the end of the day, however, there was no substantive difference between the first nomination papers and the second. As already noted, there were essentially three differences: (1) on the second nomination papers, some words were printed in all upper case letters that had been printed in upper and lower case letters in a different font on the first nomination papers; (2) the date and time of submission appeared on the line next to the voter's signature on the first nomination papers, but not on the second; and (3) the voter's typewritten name, which had been entered by the voter prior to submission, appeared on the line next to the voter's signature on the second nomination papers, but not on the first. The differences are insubstantial, and they cannot justify removing a candidate from the ballot and frustrating the right of voters to have a choice of candidates for elected office.

Both sets of nomination papers identified Brady's name and address, the office she was seeking to be elected to, the party whose nomination she was seeking, and the date of the election. There is no evidence here of a "bait and switch" scheme. Cf. Arkuss vs. Galvin, Mass. Super. Ct., No. 02-1318A (Suffolk County Apr. 12, 2002) (complaint alleging that initiative petition signature collectors misled voters by placing cover page from one petition over signature page from different petition). Nor is there any evidence of voter confusion. Cf.

Garrison, 33 Mass. App. Ct. at 117 (failure to designate political party whose nomination was sought on nomination papers had potential to mislead voters and did not amount to "mere technical[]" omission). To the contrary, as noted, it is undisputed that all 1,066 of the voters signed, or at least made some mark, in the signature box on Brady's webpage and then clicked on the box that read "Submit," thereby expressing their support for Brady's appearance on the September Republican primary ballot for the office of United States representative for the Ninth Congressional District.

For these reasons, we conclude, as we did in our order of July 13, 2020, that the electronic signature gathering process utilized by Brady complied in substance with the material requirements of Goldstein.

2. Compliance with the Secretary's advisory. We turn now to Braithwaite's alternative objection, and the SBLC's ruling, that all of Brady's certified signatures were invalid because the voters did not sign by applying a computer mouse or stylus to the signature line on the image of her nomination papers, as required by the Secretary's advisory. This need not detain us long.

The court in Goldstein directed the Secretary to "provide clear guidance to prospective candidates as to how [the] electronic signature collection process [outlined in the

decision] may be accomplished effectively, <u>although candidates need not await that guidance to get started</u>" (emphasis added). <u>Goldstein</u>, 484 Mass. at 532. In so doing, the court was not somehow authorizing the Secretary to establish "regulations" or impose additional restrictions on candidates. If that were the court's intent, it would have required candidates to await such guidance before proceeding. Our hope was that the Secretary would provide helpful information to candidates as they pivoted, in the middle of a pandemic, from traditional wet signature collection to the new world of electronic signature collection. The guidance that was provided was quite limited, largely focusing on how the electronic signature could be applied. Regardless, the Secretary's advisory does not have the force of law, and any failure to comply with it on Brady's part does not invalidate her signatures.

Even if that were not the case, the fact is that the process Brady utilized materially complied with the Secretary's advisory. As described above, when voters visited Brady's webpage, they saw a green-colored block over the first voter signature line, which read "SIGN HERE." When they clicked on that block, they were directed to a box elsewhere on the webpage, where they could use a stylus, mouse, or finger to sign their name. This is the functional, if not literal, equivalent of signing by applying a computer mouse or stylus to the

signature line on the image of the nomination papers. Certainly, reasonable voters could not have been misled as to where their signatures were going to end up (i.e., on the signature line). Moreover, that _is_ where their signatures ended up, on both the first and second nomination papers.[12]

3. _Public policy considerations_. Finally, we turn to the SBLC's conclusion that the process utilized by Brady violated public policy by allowing for the storage of images of voter signatures without their consent and without adequate measures to prevent those images from being applied to documents other than Brady's nomination papers. As the SBLC noted in reaching this conclusion, unanswered questions regarding "cybersecurity related concerns" were one of the reasons cited by the court in _Goldstein_ for not adopting a more comprehensive electronic

---

[12] We note that, following the _Goldstein_ decision, the Secretary entered into three separate agreements for judgment in the county court, which provided, under materially similar circumstances, that voters signing electronically would be deemed to have applied their signature directly on the applicable document if, among other things, "the voter engages in the physical act of signing their name . . . _in a separate signature box that is made available by an act of the voter, such as a mouse click_." See Christian _vs_. Galvin, Supreme Judicial Ct., No. SJ-2020-0444 (Suffolk County June 29, 2020) (extending, and expanding upon, _Goldstein_ process for nonparty candidates for Federal office); Better Future Project, Inc. _vs_. Galvin, Supreme Judicial Ct., No. SJ-2020-0483 (Suffolk County June 19, 2020) (same as to proponents of public policy ballot questions); Dennis _vs_. Galvin, Supreme Judicial Ct., No. SJ-2020-0278 (Suffolk County Apr. 29, 2020) (same as to proponents of initiative petitions).

signature collection model.  See Goldstein, 484 Mass. at 531.
The court continues to have those concerns.  There is no
evidence, however, that any personal information (e.g., e-mail
address or telephone number) or voter signatures have been
misapplied or improperly disclosed.  In fact, the founder of
VenueX testified without contradiction that no such thing has
occurred.  Accordingly, we do not view our concerns as
sufficient grounds for denying Brady access to the ballot.[13]

As a precaution, however, we do hereby order Brady, VenueX,
and all other persons and entities having possession of the data
entered by voters in the process of signing Brady's nomination
papers, including e-mail addresses, telephone numbers, and the
images of signatures, to destroy the same forthwith.[14]  This
order does not apply to the nomination papers that were filed by
Brady or certified by local election officials, or any copies
thereof.  Brady shall provide written certification of
compliance with this order to the court within thirty days of
the date of this decision.  The written certification shall

---

[13] We note that in the three agreements for judgment into
which the Secretary entered in the county court following the
Goldstein decision, see note 12, supra, there were provisions to
protect voters' personal information and signatures obtained
during the electronic signature collection process.

[14] The SBLC and Secretary notified the court in a letter
filed pursuant to Mass. R. A. P. 16 (l), as amended, 386 Mass.
1247 (1982), that they are not aware of any reason why the court
cannot enter an order requiring the destruction of said data.

include the name of each person and entity known to have possession of the data and the steps Brady took to make sure that they destroyed it.

Conclusion.  For the reasons stated, on July 13, 2020, we vacated the SBLC decision and ordered the Secretary to place Brady's name on the ballot for the State primary election.  As set forth more fully above, we further order the destruction, forthwith, of the data entered by voters in the process of signing Brady's nomination papers, and order Brady to file a written certification of compliance therewith with the court within thirty days of the date of this decision.

So ordered.